CORA M. HOLYOKE, Applt., *vs.* ESTATE OF FRANK H. HOLYOKE.

HENRY D. HOLYOKE et al., Applts.,

*vs.*

ESTATE OF FRANK H. HOLYOKE.

Penobscot. Opinion June 9, 1913.

*Appeal. Burden of Proof. Change of Domicil. Communications. Confidential. Declarations. Decree. Domicil. Evidence. Executors. Foreign Will. Intention. Jurisdiction. Privileges. Probate Court. Revised Statutes, Chapter 66, Section 14. Will.*

1. A person can have but one domicil at a time, and the burden is on the party who asserts a change of domicil.

2. When the question of jurisdiction depends upon the proof of domicil, it is sufficient prima facie, for him who attacks jurisdiction to show that the domicil of origin was in a State other than the one which exercised jurisdiction.

3. The presumption of the continuance of domicil is enough until disproved.

4. Confidential communications between husband and wife are in general strictly privileged and the death of the communicating party does not terminate the privilege.

5. This rule is based upon the necessity of preserving the confidence which must exist in order to create and maintain mutual happy relations and fulfill the purposes of marriage. But it does not apply when the parties are living in separation under articles of separation as in this case.

6. Communications made to an attorney in good faith for the purposes of obtaining his professional advice or opinion are privileged.

7. After the death of the client, the privilege may be waived, when the character and reputation of the deceased are not involved, by his executor or administrator, and in testamentary contest, by his heirs or legatees.

8. The evidence in this case, of declarations to counsel as to domicil are not regarded as privileged in this proceeding, as the controversy is not one that effects the estate as such, but rather the manner of its administration and distribution.

9. In testamentary contests between personal representatives, heirs and legatees, the claim of privilege is unavailing when the character and reputation of the deceased are not involved.

10. When it is necessary to show the nature of an act, or the intention with which it is done, proof of what was said by the party at the time of doing the act, is admissible.

On report. Appeals dismissed. Decree of Probate Court affirmed. Case remanded to the Probate Court for further proceedings according to law.

These are appeals from the decree of the Judge of Probate in Penobscot County, allowing the will of Frank H. Holyoke, as a foreign will. The appellants contended that Frank H. Holyoke had never changed his domicil from Maine to California, and that the burden to establish it was on the appellees.

At the conclusion of the hearing of the matter in the Supreme Court of Probate, the case was reported to the Law Court for its determination upon so much of the evidence as is legally admissible.

The case is stated in the opinion.

*George H. Worster,* for executors.

*Stearns & Stearns,* for guardian of Madeline Holyoke and Marjorie Holyoke.

*E. C. Ryder, and Charles H. Bartlett,* for Bangor Children's Home, Home for Aged Men, and Bangor Theological Seminary.

*F. A. Floyd,* for Brewer Public Library.

*Fellows & Fellows, and Hugh W. Ogden,* for Cora M. Holyoke.

*Herbert L. Harding,* for Harry Holyoke and Sidney A. Holyoke, Applts.

*Fellows & Fellows,* for same.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, BIRD, PHILBROOK, JJ.

SAVAGE, C. J. These are appeals from the decree of the Judge of Probate in Penobscot County, allowing, as a foreign will, the will of Frank H. Holyoke. One of the appellants is the widow, and the others the sons, of Frank H. Holyoke, by a prior marriage. Mr. Holyoke, who had been a lifelong resident in Maine, first at Brewer and then at Bangor, removed to Pasadena, California, in 1910, and died there, October 3, 1911. His will, which was executed August 8, 1911, was probated as a domestic will in the Superior Court for

Los Angeles County, California, a court having jurisdiction in matters of probate. The executors named in the will, having been qualified as such in California, now seek to have the will probated as a foreign will in Penobscot County, in which county there is real estate on which the will can operate. On petition therefor the Judge of Probate allowed the will, and the appellants appealed to the Supreme Court of Probate. The case is reported to the Law Court for its determination upon so much of the evidence as is legally admissible.

The vital question of fact is whether Mr. Holyoke changed his domicil from Maine to California. The appellants contend that although he moved personally to California and resided there the last sixteen months of his life, he never became domiciled there, and therefore that the court in California had no jurisdiction to allow his will as a domestic will. If this contention be correct, it follows that it cannot be allowed here as a foreign will. If Holyoke's domicil at the time of his death was in Maine, the Probate Court here has original jurisdiction to admit his will to probate, and the court in California had none.

The statute, R. S., Chap. 66, Sect. 14, provides that "a will proved and allowed in another state or county, according to the laws thereof, may be allowed and recorded in this state in the manner and for the purposes hereinafter mentioned. A copy of the will and the probate thereof, duly authenticated, shall be produced by the executor, or by any person interested, to the judge of probate in any county in which there is estate, real or personal, on which the will can operate." Then follow provisions as to notice and hearing.

It is contended in argument that the decree of the Judge of Probate in this case was not filed on a day when the Probate Court was open, and was therefore void. Without discussing what would have been the legal consequence if such had been the fact, it is sufficient to say that the case shows that such was not the fact. The decree was filed on the day of an adjourned session of the court.

The appellants also contend that the copy of the record of the court in California, filed with petition here, was not "duly authenticated" as required by Section 905, U. S. Compiled Statutes, 1901,

so as to bring it within the operation of Article IV of the federal Constitution, which declares that "full faith and credit shall be given in each state, to the public acts, records, and judicial proceedings of every other state." Section 905, above referred to, provides that "the records and judicial proceedings of the courts of any State or Territory . . . shall be proved or admitted in any other court within the United States, by the attestation of the clerk, and the seal of the court annexed, if there be a seal, together with a certificate of the judge, chief justice, or presiding magistrate, that the said attestation is in due form." It is contended that the copy of the record was not authenticated by the clerk, but by the deputy clerk. And such an attestation was held fatal in *Willock* v. *Wilson,* 178 Mass., 68. The record here, however, does not support the contention. It appears that some parts of the records of the various proceedings in the California court were attested by deputies of the clerk, but the final authentication of them in the copy filed here was under the hand of the clerk himself, and that is sufficient in that respect. Other irregularities in the proceedings were suggested in the reasons of appeal, but they are not now relied upon.

Starting then with a sufficient record of the judgment in California, what is its effect? The Superior Court in California has not only probate jurisdiction, but it is a court of general jurisdiction. *Robinson* v. *Fair,* 128 U. S., 87. Its records import a verity. *Otto* v. *Doty,* 61 Iowa, 23. In a case where it had jurisdiction in fact, its judgment is conclusive as to all facts which are necessary to the establishment of a will, and as to the regularity of its proceedings and their conformity to the law of the state where they were had. Such is the effect of the "full faith and credit" clause in the federal Constitution. *Crippen* v. *Dexter,* 13 Gray, 330; *Dublin* v. *Chadbourne,* 16 Mass., 433. But if the court had not jurisdiction in fact, its judgment is conclusive of nothing. And whether it had jurisdiction in fact is always open to inquiry, when the efficacy of the judgment is questioned. The "full faith and credit" clause does not apply in such a case. *Gregory* v. *Gregory,* 78 Maine, 190; *Smith* v. *Central Trust Co.,* 154 N. Y., 333. But it is considered that the judgment in prima facie proof of jurisdiction, that is to say, it is sufficient unless attacked.

This being so, the proponents contend that the burden is on the appellants to show that the California court did not have jurisdiction, while on the other hand the appellants contend, it being unquestioned that Mr. Holyoke had his domicil in Bangor, Maine, until 1910, that the burden is on the proponents to show that he changed it to California. The rule as to the succession of property is commonly stated to be that the domicil of origin, the prior domicil, is presumed to continue until another sole domicil has been acquired. *Mather* v. *Cunningham,* 105 Maine, 326; *Leach* v. *Pillsbury,* 15 N. H., 137. A person can have but one such domicil at a time. *Gilman* v. *Gilman,* 52 Maine, at p. 175. And the burden is on the party who asserts the change. And since the question of jurisdiction depends upon the proof of domicil, a question first in the order of proof, we think it is sufficient for him who attacks jurisdiction to show that the domicil of origin was in a state other than the one which exercised jurisdiction. The burden is then on him who asserts a change to prove it. The presumption of continuance of domicil is enough, until disproved.

When this case was taken out to be reported, all evidence offered by either side was received, but it was stipulated that the case should "be determined upon the evidence legally admissible." Besides the evidence of the acts of Mr. Holyoke, there was much evidence offered by the proponents, and some by the appellants, as to declarations made by him orally before and after he went to California in 1910, and by letters afterwards. The proponents claim that the declarations offered by them tended to show an intention to make California his permanent home, while the appellants claim that those offered by them tended to show an intention not to remain there, but to return after he had accomplished a specified purpose. Of the declarations, some were made to his wife, some to his attorneys, both in this State and in California, and others to various acquaintances. Some of the declarations were made in connection with acts or business being done by him at the time relating to his going to or remaining in California, and some were not.

The proponents object to the evidence of declarations made by him to his wife, on the ground that they are privileged. The appellants object to evidence of communications to his attorneys on the

ground that they are likewise privileged. They challenge generally the admissibility of all declarations, as to intention, except such as come within the res gestæ rule, that is, such as being contemporaneous with some act, tend to illustrate, explain or give it character. They contend that most of these declarations should be excluded for the reason that they were made at a time when Holyoke had a motive to make testimony for himself. Lastly, it is urged that they should be rejected as self serving declarations.

We will determine the merits of these contentions before we consider the evidence in detail. And first, as to communications made to the wife. They were in part while the husband and wife were living together, and in part while they were living in separation.

1. Confidential communications between husband and wife are in general strictly privileged. So rigid is the rule that death of the communicating party does not terminate the privilege. 4 Wigmore on Evidence, Sect. 2341. Hughes on Evidence, at p. 312. The communications originate in confidence. The privilege is necessary to preserve the confidence which is essential to the relation of husband and wife. While there is some contrariety of opinion as to what constitutes a confidential communication, there is none as to the privilege when the confidence exists. 4 Wigmore on Evidence, Sect. 2336. But since the rule is based upon the necessity of preserving the confidence which must exist in order to create and maintain mutual happy relations and fulfill the purposes of marriage, we think it should not apply when the parties are living in separation, and especially, as in this case, so living under articles of separation, and the one making the communication is actively hostile to the other, and is known to be so. There is no suggestion of confidence in such a relation. The parties are put on their guard. Mr. Wigmore, in speaking of such a situation in Sect. 2341, already cited, well says,—"the relation is not one in which the law need seek to foster confidence, and no privilege ever came into existence."

2. As to communications made to attorneys by clients. Such communications made to an attorney in good faith for the purpose of obtaining his professional advice or opinion are privileged. *Wade v. Ridley,* 87 Maine, 368. The reason for the rule, briefly stated, is that it is essential to the administration of justice that there should

be perfect freedom of consultation by clients with legal advisers, without any apprehension of a compelled disclosure by the legal advisers to the detriment of the clients. *Wade* v. *Ripley,* supra. But after the death of the client, it is held that the privilege may be waived, when the character and reputation of the deceased are not involved, by his executor or administrator, and, in testamentary contests, by his heirs, or legatees. *LeProhn,* Applt., 102 Maine, 455; 4 Wigmore, Sect. 2329. The deceased has no longer any interest in the privilege. The personal representatives, heirs and legatees, are all interested in the protection of the estate, and it is to be presumed that they will waive the privilege only for the benefit of the estate. The testimony objected to in this case was offered by the California executors, and it is claimed that they have the right of waiver under the foregoing rule. But this may be doubted, since the precise question to be determined in this case is whether the California court had jurisdiction to appoint them executors. If no jurisdiction, then they are not executors in this case. It may be noted that the residuary legatees, though not strictly parties to the record, appear voluntarily upon the docket and are represented by the same counsel as the proponents.. And it may be presumed that so far as they had power to do so, under the circumstances, they waived the privilege.

But it is not necessary to pursue this feature of the doctrine of waiver further, for we think that the evidence in this case, of declarations to counsel as to domicil, is not to be regarded as privileged in this proceeding, whether it be that the nature of the communications was such as to raise an implication of waiver, or such that as between personal representatives or legatees, and heirs, there is no privilege.

As in all testamentary contests, so in this case, the controversy is not one that affects the estate as such, but rather the manner of its administration and distribution. The real parties ultimately interested are the heirs and widow on one side, and the legatees on the other. It seems to be settled on good authority that in testamentary contests between personal representatives, heirs and legatees, the claim of privilege is unavailing, when the character and reputation of the deceased are not involved. In *Glover* v. *Patten,* 165 U. S.,

394, the court said that "in a suit between devisees under a will, statements made by the deceased to counsel respecting the execution of the will, or other similar document, are not privileged. While such communications might be privileged, if offered by third persons to establish claims against the estate, they are not within the reason of the rule requiring their exclusion, when the contest is between the heirs or next of kin. In *Winters* v. *Winters,* 102 Iowa, 53, it was said, "In a controversy between heirs at law, devisees and personal representatives, the claim that the communication was privileged can not be urged, because in such case, the proceedings were not adverse to the estate, and the interest of the deceased, as well as of the estate, was that the truth be ascertained." In *Doherty* v. *O'Callaghan,* 157 Mass., 90, it was held that directions to a lawyer for drafting a will did not come within the reason of the rule relating to privileged communications. In *Laymen's Will,* 40 Minn., 371, the court said, "There is abundant authority for saying that upon the decease of the only person who could in his lifetime exercise the privilege of waiver, the rule should not be so perverted by a strict adherence to it as to render it inconsistent with its object, and thus bring it into direct conflict wth the reason upon which it is founded. The object of the rule, so far as it relates to this class of communications, being the protection of the estate, there remains no reason for continuing it, when the very foundation upon which it proceeds is wanting. The testimony served to protect the estate, and tended to aid in a proper disposition of it. It is not an action in which the success of an adverse third party must prove detrimental to the property. See *Scott* v. *Harris,* 113 Ill., at p. 454. In *Blackburn* v. *Crawfords,* 3 Wall, at p. 192, it was said that "the reasons for privilege do not apply to testamentary dispositions. The disclosure in such case cannot affect the right or interest of the client. The apprehension of it can present no impediment to a full statement to the solicitor;" and further, "The client may waive the protection of the rule. The waiver may be expressed or implied. We think it is as effectual here by implication as the most explicit language could have made it. It could have been no clearer if the client had expressly enjoined it upon the attorney to give this testimony whenever the truth of his testamentary declaration should be

challenged by any of those to whom it related. A different result would involve a perversion of the rule, inconsistent with its objects, and in direct conflict with the reason upon which it is founded."

While the language used in the foregoing cases relates in the main to contests involving the probate of wills, or testamentary dispositions, the reasons for the rule apply in this case. Here is a kind of testamentary contest, not like the others indeed, but entirely analogous, so far as the question of the admissibility of evidence is concerned.

The appellants, so far as the evidence of the California attorney is concerned, place some reliance upon the California statute, relating to communications to attorneys. But it is sufficient to say that the admissibility of this evidence depends upon the law of the forum where the case is being tried. Story on Conflict of Laws, 7th Ed., Sects. 634, 635.

3. As to admissibility of declarations showing intention to change domicil.

Since the acquisition of a domicil in a given place depends upon two factors, actual personal presence there and the concurrent intent, some courts have admitted the declarations of the party tending to show intent, whether accompanying, qualifying or explaining acts, or not. *Leach* v. *Pillsbury,* 15 N. H., 137; *Ayer* v. *Weeks,* 65 N. H., 248; *Chase* v. *Chase,* 66 N. H., 588; *Kreitz* v. *Behrensmeyer,* 125 Ill., 141; In re Catharine Roberts Will, 8 Paige, Ch. 519; *Chambers* v. *Prince,* 75 Fed. Rep., 176. Even under this liberal rule, self serving declarations are excluded; so are those made after the beginning of a controversy, or after the declarant had an interest to make evidence for himself. The ground on which declarations are held admissible to show intention is stated in *Insurance Co.* v. *Hillmon,* 145 U. S., 285, as follows:—"A man's state of mind or feeling can only be manifested to others by countenance, attitude or gesture, or by sounds or words, spoken or written. When the intention to be proved is important only as qualifying an act, its connection with that act must be shown, in order to warrant the admission of declarations of the intention. But whenever the intention is of itself a distinct and material fact in the chain of circumstances, it may be proved by contemporaneous oral or written

declarations of the party." Mr. Wigmore inclines to this view, holding it more logical. 3 Wigmore on Ev. Sect. 1727.

But the rule declared in this State is more limited. The cases involving the admissibility of declarations tending to show intent, here as well as in Massachusetts, from which State we derive the rule, have been mainly pauper suits and tax suits. And in the latter class, the declarations offered and excluded have been generally of a self serving character. *Wright* v. *Boston*, 126 Mass., 161, is an example. The rule is stated variously, but always to the same effect. "Where it is necessary to show the nature of an act, or the intention with which it is done, proof of what was said by the party, at the time of doing the act, is admissible." *Gorham* v. *Canton*, 5 Maine, 266. "When one is doing a certain act, declarations of his motives and intentions at the time are admissible. But when he is doing no act, in itself indicative of a change of place, for one purpose or another, we are not aware that the verbal expression of his intention can be received." *Wayne* v. *Greene*, 21 Maine, 357. Declarations respecting an intention, in going from one place to another, made days before the declarant left, and unaccompanied by any acts, held inadmissible in *Bangor* v. *Brunswick*, 27 Maine, 351. "The declarations of a party to a transaction, made at the time of the acts done, and expressive of their character, motive or object, are regarded as verbal acts, indicating a present purpose or intention," and are admissible. "But declarations cannot with propriety be received as evidence, unless the act which the declarations accompany, has itself a material bearing upon the issue presented. *Corinth* v. *Lincoln*, 34 Maine, 310. Declarations of one then in the pursuit of his ordinary business, just starting on a voyage to sea, on which he was to be employed several months, as to his future expectations and intentions, after he should have completed the voyage, held not admissible in *Richmond* v. *Thomaston*, 38 Maine, 232. In *Knox* v. *Montville*, 98 Maine, 493, it was contended that *Baring* v. *Calais*, 11 Maine, 463, was authority for the doctrine that declarations disconnected with any distinct acts which would themselves be evidence, are admissible. The question was again examined, with the result that the rule above stated was adhered to. The court said, "A person's intention can only be shown by his acts and words, but

a mere expression of intent disconnected with any relevant circumstances would be too remote to be admissible as evidence,   .   .   .
The pauper's intention is a question of fact. He could himself testify to it; and his declarations could be received in evidence of it, but only if accompanying acts which they explain, so that they are regarded as a part of acts from which his intention may be inferred."

The earlier Massachusetts cases are to the same effect. *Thorndike* v. *Boston,* 1 Met., 242; *Kilburn* v. *Bennett,* 3 Met., 199; *Salem* v. *Lynn,* 13 met., 544; *Reeder* v. *Holcomb,* 105 Mass., 93; *Wright* v. *Boston,* 126 Mass., 161. It should be noted, however, that the Massachusetts court appears to have changed its view. In *Viles* v. *Waltham,* 157 Mass., 542, after stating that declarations of a person accompanying a change af his residence have always been held competent to explain the change as a part of the res gestæ, the court added, "but declarations in these cases are often admissible. on a broader ground than as a part of the act of removing from one place to another. The intention of the person removing is competent to be proved as an independent fact, and everything which tends to show his intention in making the change may be introduced, if it is free from objection in other particulars. The intention may be inferred from acts and conduct, and conduct which tends to show the intention is competent for that purpose. Declarations which indicate the state of mind of the declarant naturally have a legitimate tendency to show intention." See *Com.* v. *Trefethem,* 157 Mass., 180.

Whichever doctrine may be founded in the better reason, the doctrine in this State is settled, and we do not feel at liberty to change the rule, so many times, and so recently, considered and declared. The rule, however, does not limit admissibility to declarations accompanying acts of removal, acts of merely coming and going. In *Deer Isle* v. *Winterport,* 87 Maine, 37, declarations accompanying the acts of breaking up housekeeping and storing household goods two or three weeks previous to leaving town were admitted. The court said:—"A person's intention can only be shown by his acts and his words, and any of his acts and words which tends to show his intention are admissible in evidence. With proper caution, however, the law does not admit mere words unconnected with any

material act, and which the person had no occasion to speak. A mere verbal expression of some past or future intention, not called out by relevant circumstances, but uttered voluntarily and perhaps officiously, may be too remote to be of any evidential value. Such an expression, however, called out by material circumstances, and naturally made at the time in explanation of some visible, relevant conduct, is of some, even if of small, evidential value as to a person's actual intention." It should be borne in mind that the acts which declarations must accompany, to be admissible must be relevant to the issue of domicil. *Deer Isle* v. *Winterport,* supra; *Wright* v. *Boston,* supra. It only remains to add in this connection, that the rules of evidence are necessarily the same, whether it be the domicil of a pauper that is in issue, or that of a testator.

4. Declarations which may have been uttered for the purpose of making evidence are excluded on the issue of what was the intention or state of mind of the declarant, unless they are made under such circumstances as to give to them some corroboration. In general, such corroboration is found in the fact that they accompany and explain acts which of themselves would be competent evidence on the issue involved. They are then admissible as part of the res gestæ. *Viles* v. *Waltham,* supra. The same rule applies to declarations made after the controversy has commenced. *Ayer* v. *Weeks,* supra.

5. It is objected that some of Mr. Holyoke's declarations were inadmissible because made in his own favor. But that point is not tenable. Mr. Holyoke is not a party to this proceeding. He is not self served by them.

There are two or three minor matters of evidence to be alluded to later.

These rules must now be applied to the evidence, of which we can give only a brief summary.

Frank H. Holyoke, a lifelong resident of Brewer and Bangor in this State, went to California early in June, 1910, and resided there until he died, October 3, 1911, at the age of 67. In his lifetime he had been engaged in timberland and mill business until 1906 or 1907, when he sold most of his timberlands and invested the proceeds in stocks and bonds. After that he had little or no business. He had been twice married and twice divorced. By his first wife he had two

sons, who are appellants. From them he had been long estranged. It does not appear that he had any relatives in Bangor. His brother Jacob lived in the old homestead in Brewer. He had a second cousin living in Brewer. In January, 1898, he married his third wife, now his widow, and an appellant. Each winter thereafter, except one, they spent in California, at Los Angeles, San Diego, or Pasadena, at hotels. Each spring they returned to Bangor. There they lived at a hotel for several years, during the summer and autumn. In 1901 he purchased a residence in Bangor, which he refurnished in 1906 at great expense.

On February 5, 1910, at Pasadena, he and his wife had trouble. He accused her of infidelity with his chauffer. He compelled her to leave the hotel where they were boarding. An agreement of separation was executed, by which he was to pay her $5000 at the time and $5000 within a year. She was to have the automobile. She agreed to relinquish all claim of support from him, all claim upon his estate, and all interest in his lands, the Bangor residence, and the "contents" of the home were particularly referred to. In the house at that time was furniture which he had previously given to her. Early in March, 1910, he returned to Bangor, and remained until June, when he went again to Pasadena, and resided there until he died, sixteen months later. Mrs. Holyoke returned to Bangor in April, 1910, and since then has resided there. At some time before he went to Pasadena in June the residence in Bangor had been placed in a real estate agency for sale, but it has never been sold. Before returning to California in June, he arranged to have his stocks and bonds, which were in safety deposit boxes in Bangor, $300,000 in amount, shipped to him at Pasadena, and this was done. He caused the furniture in the Bangor residence to be shipped to him in September, 1910. At Pasadena, he lived with friends, the Marstons, in a house he had built for them, until about two months before his death, when he went to a hotel in the same place. To these friends he sold part of the furniture. The rest he took to the hotel with him. He caused a chauffer with his family to go from Bangor to Pasadena, in November, 1910, and not being able to rent a satisfactory tenement, he bought a house for them. He had letter

heads made, giving his name and residence at Pasadena. In June, 1910, he had a will drafted, in which he stated his residence at Pasadena. This will does not appear to have been executed. He registered in 1910 and 1911 at two hotels, as of Pasadena. He described himself as of Pasadena, in a discharge of a mortgage, executed in November, 1910. June 28, 1910, he filed in the court in California an application to perpetuate testimony to be used in a divorce proceeding which he stated therein he expected to file on or about June 1, 1911. He described himself as a resident of Pasadena. It does not appear that any testimony was taken, and he never commenced divorce proceedings in California. September 19, 1910, Mrs. Holyoke began divorce proceedings in Penobscot County. At the April term, 1911, after notice to him, Mr. Holyoke appeared by attorney, and the case on his motion was continued. July 17, 1911, he began a cross libel, which was filed August 3. Notice was ordered, returnable to the October term of the court in Penobscot County. He died on the day of entry. March 7, 1911, he made formal application to be registered as a voter in Los Angeles County, and described himself therein at a resident of Pasadena, and stated that he had resided in California for one year next preceding. August 8, 1911, he made his last will describing himself in it as a resident of Pasadena. In the will, among other things, he gave his wife $1000, his sons $100 each, made various charitable bequests, gave the residuum to his nieces, daughters of his brother Caleb, and directed his burial to be in Bangor.

The appellants introduced declarations as follows:—Mrs. Holyoke testified that prior to 1906, she having expressed a wish to live in California, he said perhaps he would go; but that after the San Francisco earthquake he said "he wouldn't live in the damned hole if they would give him the whole state;" that in March, 1910, after the separation, she saw him in Passadena, when he said "he wanted her to stay in California, so that he could go home and live in his Bangor house in peace;" that at his office in Brewer, about May 18, 1910, he said to her "Now that you have come here I am going to California and stay until I can get a divorce. Why in Hell didn't you stay in California as I wanted you to, so that I could live in my home in peace. If you follow me to California, I will come back home. If you try to follow me you will have to travel some;"

that she said "Couldn't both of us live in the same place?" that he replied, "No, not by a damned sight;" that he said "After he got his divorce he didn't care where in hell I lived."

Harrison C. Young, a public carriage driver testified that prior to Memorial day, 1910, he carried Holyoke from Bangor to Brewer, and that on the trip Holyoke said he was going to California, but not to stay for any great length of time, that he was too old a man to change his residence and make new friends. This witness also testified that in August 1910, he received a letter from Holyoke in which he asked him to mail an enclosed letter to Mrs. Holyoke six months after his death, and an enclosed note twelve months after his death. The note enclosed was dated June 15, 1911, was for. $10,000 payable on demand to Mrs. Holyoke, and was signed by Holyoke.

Charles E. Goodwin, a brother of Mrs. Holyoke, testified that he met Holyoke on the street in Boston in June, 1910, which evidently was when the later was on his way to California; that he said he was going west; that when the witness expressed surprise that he was going west in the summer season, he replied, "I am coming back again. I am through with your sister. I am going to California, and I am coming back here again."

John M. Lane, a Pullman car conductor, who had met Holyoke several times in Los Angeles in 1905, testified that he met him casually in Boston on School Street in the summer of 1910, evidently when Holyoke was on his way west, and that he said "he had had trouble with his wife, and was going to get rid of her;" that he "was going out there and get rid of his business and coming back here to stay."

Joab W. Palmer testified that Holyoke told him in 1910 that he had spent some very pleasant winters in California, that it was pretty hot in summer, and he didn't like it as well as in Maine.

Luther J. Fickett testified that in May, 1910, Holyoke told him he was going to California, that he might be gone until fall and perhaps until spring, for he wanted to be rid of the cold weather.

Charles R. Goodwin, father of Mrs. Holyoke, testified that he had an interview with Holyoke in Bangor; that he said he did not know where Mrs. Holyoke was, nor where she could be reached; that he said "I am all done with her. I am back here to get a divorce, and

she must not come here; that on April 15, Holyoke said, "That daughter of yours has got back to Boston. I want you to stop her and not let her come to Bangor. She shan't come to my house, and she mustn't come to Bangor. If she comes here I will make it damned hot for her."

The proponents offered declarations as follows:—Hugh R. Chaplin, the attorney of Mr. Holyoke in Bangor, testified that Holyoke came to his office in Bangor in April, 1910. "We talked over the trouble between him and his wife. He told me what he said had taken place in California. Told me of the contract, and we discussed it. Said he had given her all he was going to give her if there was any way to prevent her having any more. I told him I wanted to think it over, and to come in again. A day or two later I said to him, which was true, 'You have been telling me for a number of years of your intention of moving to California.' Now you have had two divorces here. I think in the eyes of the community they have been nasty. In my judgment you cannot get a divorce from Mrs. Holyoke without a contest on her part, and I believe it will be a vigorous contest. You will have to bring witnesses here from California, I believe, to protect your interest, because you will not know and cannot know what you will have to meet. Again, if you should die a resident of Maine, I know of no way to prevent her from getting a third of the property which you shall leave. I understand that if you should die a resident of California that she can get only a certain proportion of the property which you have acquired since you married her. Now I want in a way to confirm that, and if my understanding of the California law is correct, I am going to advise you that now is a good time to move to California if you have not changed your intention of finally going there. He told me that he had some time in February declared, in California, his intention of making California his home. I told him I would not want to base domicil in California upon that declaration. A letter was written to California and a letter came back confirming me. I advised him to move to California, and he said he would move. He asked me how soon he should go. I told him the sooner the better, because he would have to live there a year before the court could get jurisdiction to grant him a divorce there."

"After he left, at his request, I published a notice forbidding anybody to trust anybody on his account." "He asked me what he would do with his furniture. I told him he could do anything he wanted to with it. He wanted to know if he could take it to California, and I said certainly."

Bisbee B. Merrill testified that in April or May, 1910, Holyoke told him what had happened between him and his wife, showed him the agreement for separation, and said that he "purposed going to California to live.

Joseph B. Atwood, employed in May, 1910, to take care of the Bangor residence until the furniture should be shipped, testified that he packed some papers, by Holyoke's directions, that were to go with the furniture; that the witness said to him, "It looks as if you was going out there to stop awhile," and that Holyoke replied, "I am going out to make my residence there. I have been out over the Rocky Mountains, I guess, a dozen times, and I am going out there to stop now." On cross-examination the witness said that Holyoke said he would settle for his work when he came back.

Albert B. Taylor, one of the executors, testified that he talked with Holyoke at the Bangor residence in April or May, 1910: "He did not then tell me as to the trouble between him and Mrs. Holyoke. I told him I had become interested somewhat in going to the east coast of Florida. He said 'If you go anywhere, I would advise you to go to southern California. I have been there for a number of years. It's a fine climate, and a person would in all probability live ten years longer out there than here.' I said 'I am sure I wouldn't want to go out there, because they have earthquakes out there.' He said 'No, not in the vicinity of Pasadena. That is outside of the earthquake belt.' Then he told me of the trouble he had been having, and that he was making preparations to close up his affairs here in Maine and go to California to live there permanently. He said 'If I send for you will you go?' Said he couldn't tell when he was likely to get away, but should settle up his affairs as soon as possible, and get away as quickly as possible. I had a letter from him in which he said (Sept. 16, 1910) 'I don't expect to get east until about one year from this time and never again to make it my residence.' Holyoke once said in Pasadena, 'If you have an office, I want to hire desk room of you.' "

Mrs. Taylor, wife of the preceding witness, corroborated her husband's testimony, and added that Holyoke said:—"I am going to leave Bangor and make my permanent residence with my adopted sister, Mrs. Marston."

Edwin F. Hahn, Mr. Holyoke's attorney in California, testified that he drafted the agreement of separation, and that Mrs. Holyoke confessed her infidelity. (It is fair to Mrs. Holyoke to say here that in her testimony she denies making confession, and denies improper relations with the chauffer.) Mr. Hahn says that during the week following the separation, Holyoke remarked that he could not stand the winters in Maine, that he was ashamed of going back to Bangor, and then that he used these words: "If it was not my desire to proceed immediately with the divorce suit in Maine I should not go back there. How long would I have to wait in California? Would I have to wait a great while?" I said "You would have to be a resident of California a year before you could apply for a divorce here." Finally he said "What must I do to become a resident of California?" I said "You must have the intent, and follow it up with the act. If you decide to become a resident of California you should declare it in some way or manner." He said "Ed Hahn, take notice that I declare that I am going to be a resident of California." Mr. Hahn says further that Holyoke showed him the Marston house while it was being built and called it "my house," that he showed him a particular room, and said "Don't you think this would be a comfortable place to spend my remaining years?" He said he was to occupy it as long as he lived, or until his death, and wanted Hahn to draw up an agreement with the Marstons to that effect.

In a letter written November 20, 1910, to his former partner he said "I wish you would have that sign (F. H. Holyoke) taken off the office door, as that will never be my headquarters again, and as it is now it might be misleading." In a letter written November 11, 1910, to Kenney, his collector of rents and general caretaker in Bangor, he said "You will notice that I have changed my address which will hereafter be permanent." He was referring to a change in the street number. In this letter he enclosed a photograph of himself in a garden at the Marstons', on which he had written "F. H. H. in his garden, Pasadena, California." In a letter written

September 16, 1910, to Taylor, now one of the executors, who then lived in Bangor, he said "I don't expect to get East until about one year from this time, and never again to make it my residence." In the letter he urged Mr. Taylor to come to Pasadena to live. In another letter to Taylor, dated March 11, 1911, he asked, "Are you yet thinking of coming to Pasadena or Los Angeles to make your home in the future?" and added, "Why I ask is that at some time soon I may have to name a new executor in my will," and asked Taylor to give him his name in full in his next letter.

The foregoing statement presents, we think, all the facts in the case which can be regarded as material. The appellants object to Holyoke's statements of residence contained in his will, in his application to be registered as a voter, in his registry in hotels, and in the discharge of his mortgage. In some cases, where they have been offered by the party himself, such declarations have been excluded. They were self serving statements. Such was the case in *Wright* v. *Boston,* supra, though the court held that the papers in which the declarations were made were not relevant to the issue of domicil. But the court in *Ennis* v. *Smith,* 14 How., 400, said, "Declarations of residence in wills have always been received in evidence." The purpose of stating the residence of a testator in a will, or of a party to a deed or other written instrument, is in part at least to identify the party *by his residence* from all others who may chance to have the same name. The statement of residence is therefore material to the act. It is a part of it. And so considered, we think, the act is relevant and probative. So of registry at a hotel. Such declarations under some circumstances may have little significance, but we think they are admissible for what they are worth. *Rockland* v. *Deer Isle,* 105 Maine, 155; *Ward* v. *Oxford,* 8 Pick., 476; *Shannon* v. *Shannon,* 111 Mass., 331. Objection is made to the proof of the hotel registries by photograph. That is immaterial. The fact sufficiently appears without the photographs.

Under the rules already stated, as to the admissibility of declarations, we think the declarations made by Mr. Holyoke to his wife before their separation are inadmissible; that those made afterwards are admissible. The declarations made to Young in May, 1910; to Palmer; to Fickett; to Charles R. Goodwin; to Merrill; to Mr. and Mrs. Taylor; on the photograph, "F. H. H. in his garden;" and

in the letter to Taylor, of September 16, 1910, so far as they are declarations as to intention, must be excluded from consideration. They are not res gestæ to any act, or if so, not to any act relevant to the issue of domicil.

It is not possible, within the reasonable length of an opinion, to discuss the remaining evidence in detail. We have studied it with great care. The conclusion at which we have arrived is by no means free from doubt, but the opposite conclusion would, we think, be more doubtful. See *Mather* v. *Cunningham,* 105 Maine, 326.

.It being admitted that Maine was the domicil of origin of Mr. Holyoke, the burden is on the proponents to show either that he went to Pasadena with the intention of making that place his home for an indefinite time, or that at some time, being in Pasadena, he formed the intention of remaining there as a home for an indefinite time. The result would be the same in either case. Domicil is defined as the habitation fixed in any place without any present intention of removing therefrom. *Putnam* v. *Johnson,* 10 Mass., 488. This definition was applied in *Warren* v. *Thomaston,* 43 Maine, 406, and was expressly approved in *Gilman* v. *Gilman,* 52 Maine, 165. To effect a change of domicil there must be actual residence in the new place, and an accompanying intention to make it the real, true, fixed home.

The purpose of an attempted change is not material, except as it tends to strengthen the probabilities, one way or the other. *McConnell* v. *Kelley,* 138 Mass., 372. The appellants contend that Mr. Holyoke's sole intention was to go to California, reside there long enough to give the California court apparent jurisdiction in a proceeding for divorce, get a divorce, and then return to Maine. Such an apparent change in domicil would be colorable merely, not real. No change of domicil would be effected in such case. *Sewall* v. *Sewall,* 122 Mass., 161. It may be conceded, for we think it is quite likely true, that such was at one time Mr. Holyoke's purpose. But the evidence leads us to think that after his interview with Mr. Chaplin, he formed another purpose. He had learned that if he died domiciled in Maine nothing could prevent his wife, if undivorced, from obtaining a much larger portion of his estate than if he died domiciled in California. He seemed determined that she should have no more than he had already given her. He apparently

relented afterwards to some extent, for he sent to a friend his note for $10,000 to be given to her one year after his death. And we think he meant by this, death in California, for if he expected to return to Maine and die here, the statutes of Maine would amply provide for her. Even if one of his purposes was to deprive his wife of that share in his estate which the laws of Maine would give her, still if he went to California with a bona fide intention to reside there as a home for an indefinite time, or formed such an intention after reaching there, it effected a change in domicil. And that purpose could be accomplished only by so residing there until his death.

The appellants contend, we may say in passing, that his giving the residence of his wife in his cross-libel as "of Bangor," was a recognition of a fact that his own residence was then in Bangor. Hardly so. For many purposes, a wife's domicil may be separate from her husband's. Witness hundreds of divorce libels in this State. See *Burlington* v. *Swanville*, 64 Maine, 78.

The circumstances of his life in California tend to show a purpose of staying there. He had all his personal estate in stocks and bonds sent to him there. He had his household furniture shipped there. It is true he might have done all this, if he had intended to return. If it was his sole purpose to stay there only long enough to get a divorce, that is, one year, he might, indeed, have taken these rather unusual steps to give color to a claim of California domicil, or to prevent their being reached by his wife in Maine. But after he went to California, though he began proceedings to perpetuate testimony for a divorce suit, he did not pursue them. He took no such testimony. He evinced no undue haste. After notice of his wife's pending divorce proceeding in Penobscot county was served upon him, he voluntarily made his appearance in the proceeding, and became so far a party to it that a judgment for alimony against him would be valid against his estate wherever it might be. There was no longer any occasion for his remaining in California to prevent the wagging of the tongues of scandal in Bangor. The controversy was bound to be ventilated in the court in Bangor. And yet, he continued to reside in Pasadena through the heated season of 1911. He even brought a cross-libel in the court at Bangor, that the whole matter might be settled here. And after that, when he no

longer had any reason to claim a California residence for divorce purposes, he made his will in which he declared Pasadena was his residence, and indicated an expectation, more or less strong, of dying away from Bangor, in that he expressly directed his burial to be in Bangor.

In November, 1910, he had a new chauffer go out from Bangor, and not finding a satisfactory rent, purchased a house for him. And all this when only a little more than six months remained before he would have acquired a domicil in California supposably sufficient for divorce purposes. He urged the Taylors to "come" to California to live. If he ever had the intention of coming back to Bangor to live, his selling the furniture which he had shipped from his Bangor residence would rather indicate that he did not expect to refurnish that house. In March, 1911, after he knew of the pendency of the divorce proceeding here, and that some part of the troubles between him and his wife must be aired here, he sought registration as a voter there.

Mr. Holyoke's declarations offered by the appellants and considered by us indicate that his intention at the time they were made was to go to California for a temporary purpose. But even then they are not inconsistent with a later settled purpose of residing there indefinitely. And such a purpose, we think, the evidence tends to show he had.

It is true that old men do not transplant easily, and that in the decline of life men's minds and wishes revert to the friends and associations of former years. But in this connection it is to be remembered that in Bangor he had no kindred of near degree, none there to whom he had a right to look for the care which old age craves. The evidence is silent as to his social intimacy with his relatives in Brewer. Who his other social intimates were, or whether he had any, does not appear. But it does appear that when he decided that his wife should receive his $10,000 note after his death, he entrusted it to a public carriage driver, known to him. He had no business interests to draw him to, or keep him in, Bangor. The most important part of his property remaining there was his house, and that unfurnished, and for sale.

On the other hand, he had for ten years spent several months each winter and spring but one in California, and latterly in Pasadena.

It had been his winter home. He had acquaintances there. And there were the Marstons, for whom he built a house, and with whom he lived for many months, and with whom he was so intimate as to call Mrs. Marston his "adopted sister." It would not seem at all strange if he concluded that to live permanently in Pasadena would be more agreeable than to live in Bangor, where his wife lived, to whose living in the same place where he did, he had expressed at the outset a strong repugnance.

To change one's domicil is not difficult; it is easy. Given bodily presence, it is but to form a purpose. It is but to conceive an intention. It is done in the twinkling of an eye. Intention may be shown by conduct, without words, or it may be shown by both, under limitations already stated.

Upon the whole, our conclusion is that the proponents have fairly sustained the burden of showing that Frank H. Holyoke, before his death changed his domicil from Maine to California, and that the court in California had jurisdiction to admit his will to probate, as of one domiciled in that state. It follows that the decree of the Judge of Probate appealed from was right, and must be affirmed. The certificate will be,

*Appeals dismissed.*
*Decree of the Probate Court affirmed.*
*Case remanded to the Probate Court for*
*further proceedings according to law.*