STATE of Maine

v.

Eugene A. BENNER.

Supreme Judicial Court of Maine.

Dec. 3, 1971.

---

Peter T. Dawson, Asst. Atty. Gen., Augusta, for plaintiff.

Verrill, Dana, Philbrick, Putnam & Williamson by Roger A. Putnam, Michael T. Healy, Portland, Strout, Adams & Payson by Joseph E. Pellicani, Rockland, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

Defendant was indicted at the October 1969 Term of the Superior Court in Knox County. In three separate counts, the indictment charged that defendant had committed the crimes, respectively, of kidnapping, assault with intent to kill, and assault with intent to rape a female (identified) over the age of fourteen years and not standing in the relation of parent or child to the defendant.

In the midst of manifold maneuverings which had commenced when the prosecution had served and filed a demand for notice of alibi and defendant, by appropriate motion, had sought a bill of particulars, defendant moved for a change of

venue. The motion was granted and on November 28, 1969 the case was transferred to Lincoln County for subsequent proceedings and trial.

Defendant pleaded not guilty and a trial by jury was commenced on February 23, 1970. At the conclusion of all of the evidence, defendant moved for judgment of acquittal on the three counts of the indictment. The Court sustained the motion as to the count charging the crime of assault with intent to kill, and as to that charge judgment of acquittal was entered. On the other two counts the Court denied defendant's motion for judgment of acquittal. The jury found defendant guilty of the crimes of kidnapping and assault with intent to rape.

Defendant has appealed to this Court from the judgment of conviction.

## I.

We consider, first, those aspects of the appeal relating to the interrelations of (1) the demand by the State for notice of alibi, (2) the separate motion by the defendant requesting a bill of particulars and the original and amended bills of particulars filed by the State in response to defendant's motion, and (3) various rulings by the Court on both the demand for notice of alibi and the bills of particulars.

The problems presented arise from a multitude of motions and documents filed pursuant to Court orders made on the motions as well as the substance of the Court rulings themselves. We have extracted those events and features which we consider to be critical to the disposition of the case.

On October 10, 1969, two days after the return of the indictment against the defendant, the State served and filed a demand for notice of alibi—Rule 16(b) M.R. Crim.P. The demand stated that it was the intention of the State to prove that the acts charged were committed:

" * * * approximately between the hours of 11:50 P.M. on August 28, 1969 and 3:00 A.M. on August 29, 1969."

On October 13, 1969 defendant objected to the State's demand for notice of alibi, asserting that it failed "to state a specific time, as distinguished from a range of time." On October 15, 1969 the Court upheld the adequacy of the demand for notice of alibi as stating "a specific * * * time in compliance with Rule 16-b." On October 21, 1969 defendant requested Court approval of an interlocutory appeal to the Law Court to assess whether it is proper under Rule 16(b) "for the State in a Demand for Notice of Alibi to set a range of time rather than a specific time when the alleged offenses occurred." On December 4, 1969 the Court denied an interlocutory appeal.

Simultaneously, however, the Court,— (although continuing to allow a single range of time for all three offenses rather than requiring a specific time to be allocated separately for each offense)—on its own motion, removed the word "approximately" and thus made the *range* of time *exact,* restricting it to "between the hours of 11:50 p. m. on August 28, 1969 and 3:00 a. m. on August 29, 1969." (Hereinafter, "demand for notice of alibi" will signify the demand as amended by the Court.)

After the Court had initially upheld the demand for notice of alibi and before the Court's subsequent amendment eliminating approximations, and while the time was still running under a Court-allowed extension for the defendant to serve and file notice of alibi, defendant, on October 21, 1969, seasonably served and filed a motion for a bill of particulars, as allowed by Rule 7(f) M.R.Crim.P. In this motion defendant requested (inter alia) *as to each offense* a statement of the "exact time that the offense commenced and the exact time when * * * alleged victim * * * was released by her alleged assailant." [1]

1. We cannot speculate as to whether defendant would have filed the motion for a bill of particulars had the Court ruled on October 15, 1969 as it subsequently

On November 25, 1969 the Court granted defendant's motion for a bill of particulars and ordered the State to furnish "the time when the offense alleged * * * was committed."

On December 1, 1969 the State served and filed a bill of particulars stating:

"The offenses were committed * * * approximately between the hours of 11:50 p. m. on August 28, 1969, and 3:00 a. m. on August 29, 1969."

On December 5, 1969, defendant objected to this bill of particulars and on December 19, 1969 the Court ordered:

" * * * the particulars objected to are stricken, and the State is ordered to file a new bill of particulars * * *, to be filed (in the mail) on Dec. 20, 1969."

On December 20, 1969 the State filed new particulars reciting that the "offenses * * * were committed between the hours of 9:30 p. m. on August 28, 1969 and 8:00 a. m. on August 29, 1969." The State made service of this new bill of particulars upon the defendant by use of the mail. Because the new bill of particulars arrived at the office of counsel for the defendant on December 22, 1969, while counsel was absent from the office, and counsel for the defendant first opened and reviewed his mail on the morning of December 23, 1969, defendant became aware of this bill of particulars, and its contents, one day *after* December 22, 1969,—the expiration date for defendant to serve and file notice of alibi.

By the expiration date, December 22, 1969, defendant had failed to file a notice of alibi. The failure was unconnected with the contents of the amended bill of particulars filed on December 20, 1969 since, as shown above, counsel for the defendant was unaware of the existence of the amend-

---

ruled on December 4, 1969—to allow a range of time but eliminate the word "approximately." The wording of the motion for a bill of particulars indicates that the defendant was seeking significantly more than the mere elimination of the word "approximately" as modifying a *total* range of time within which three separate offenses were stated to have taken place; defendant was asking, as to *each* of the three offenses the *exact* time of commencement and the *exact* time of termination regarding *each specific* offense. It would thus appear that even had the Court acted on October 15, 1969 to produce the result which finally was effectuated on December 4, 1969—(allowing a total range of time to stand but making it exact rather than approximate) —defendant would, nevertheless, have filed the motion for a bill of particulars in an effort to achieve a specific time separately designated for each offense.

We are constrained, therefore, to decide the case on the basis that the motion for a bill of particulars was in fact served and filed and continued to function thereafter in the case—independently, and regardless, of the motivations which might have induced it. At no time prior to trial did the defendant seek to have his motion for a bill of particulars withdrawn from the case or its effects and consequences nullified. Neither did defendant attempt to make a record showing that (1) the only reason defendant had filed the motion for a bill of particulars was that the Court, even though allowing a range of time to be operative, had refused to require a specific range and left it approximate, and (2) once the Court had rectified the "approximation" deficiency, defendant considered the motion for a bill of particulars superfluous and, therefore, wished to have it withdrawn and all developments and consequences which had resulted from it stricken from the case. In the absence of such affirmative record we must infer that defendant was using his motion for a bill of particulars in a continuing attempt to achieve, for purposes of delimiting the scope of proof at trial, a specific time separately allocable to the commission of each offense rather than one range of time (even though exact as a range), covering all three offenses.

This proposition remains correct despite the fact that defendant has seen fit to omit assigning, in his appeal, as alleged reversible error the failure of the Court below to require a specification of an exact time for each of the three offenses, (as distinguished from one total range of time for all three offenses) and here relies only on the point that the range of time of the bill of particulars was broader than the range of time of the demand for notice of alibi.

ed bill of particulars, or of its contents, until *after* the time for serving and filing notice of alibi had expired.

After a series of additional moves by the parties, on February 17, 1970, defendant served and filed a "Motion to Determine the Validity * * *" of the December 20, 1969 bill of particulars. The ground of invalidity asserted was that in the particulars there was stated a time range for the offenses *broader* (9:30 p. m. on August 28, 1969 to 8:00 a. m. on August 29, 1969) than that specified in the demand for notice of alibi (11:50 p. m. on August 28, 1969 to 3:00 a. m. on August 29, 1969). For this reason, defendant claimed that the amended bill of particulars be stricken and the State be ordered to file a new bill of particulars "consistent with the Demand for Notice of Alibi."[2]

On February 18, 1970 the Court "dismissed" defendant's "Motion to Determine the Validity * * *." Thus, in effect, the Court allowed, for purposes of trial, a total time range extending "between the hours of 9:30 p. m. on August 28, 1969 and 8:00 a. m. on August 29, 1969" within which, and without fatal variance, the prosecution could prove that all the offenses had been committed.

This ruling of the Court on February 18, 1969—by which the State was given the benefit of a range of time, for purposes of the scope of proof at trial, more extensive than that delineated in the demand for notice of alibi—defendant asserts to be reversible error.

The same concepts are involved in defendant's second claim for reversal,—that the Court erred in refusing to charge the jury as defendant had explicitly requested that:

"The State having declared [in the Demand for Notice of Alibi as amended by the Court on December 4, 1969] that the dates of the offenses which it elected to prosecute were August 28, 1969 from 11:50 p. m. to August 29, 1969 at 3:00 a. m., its proof is limited to those dates and within the range of time they have specified, 11:50 p. m. to 3:00 a. m., and to justify a conviction, the State must prove to you beyond a reasonable doubt that the offenses occurred within the following range of time: Between the hours of *11:50 p. m. on August 28, 1969* and *3:00 a. m. on August 29, 1969.*"

The requested instruction was, in substance, a last resort attempt by defendant to achieve, during trial, a change of the ruling made prior to trial and which had refused to require the amended bill of particulars filed by the State to specify a time-period identical to that contained in the demand for notice of alibi.

Thus, the assignment of error as to the Court's ruling on the motion of defendant to test the validity of the amended bill of particulars and the refusal of the Court, during trial, to give the requested charge— the judge in his charge having informed the jury that the expanded period of the amended bill of particulars was operative— present the same issue of law and will hereinafter be so considered.

The heart of defendant's position on the issue is the contention that the demand for notice of alibi, immediately upon its being served on the defendant, performed the function not only of prescribing time limits as to which defendant was to furnish alibi information to the prosecution in advance of trial but also of providing to the defendant the equivalent of a bill of particulars which would control the scope of the prosecution's right to offer proof at trial as to the time (and place) of the commission of the offenses charged in the in-

2. Although this bill of particulars might be said to have failed to comply with the Court Order of November 25, 1969, that the State furnish "the time when the offense [singular] alleged * * * was committed", defendant now elected to make no such objection, and instead relied solely upon a claim (the same as the one he has advanced in this appeal) that the time range of the bill of particulars was broader than that designated in the demand for notice of alibi.

dictment. In support of this foundational point of his argument the defendant relies upon State v. Lizotte, Me., 249 A.2d 874 (1969) and State v. Miller, Me., 253 A.2d 58 (1969).

In State v. Lizotte, supra, this Court said:

> " * * * it is held that a demand for notice of alibi is equivalent to a bill of particulars." (249 A.2d p. 879)

The extent to which this language is to be deemed controlling precedent, for the purposes of stare decisis, requires that it be evaluated in light of the particular facts which were before the Court. In *Lizotte,* the Court was dealing with the circumstances that (1) the time had gone by under Rule 16(b) in which defendant was to file notice of alibi in response to the State's demand, (2) the defendant had failed to serve and file any notice of alibi, (3) there was entirely absent any attempt by defendant at any time, either prior or subsequent to the State's service of a demand for notice of alibi, to seek independently a bill of particulars, and (4) the issue of whether the State's demand for notice of alibi had assumed the additional function of operating as a bill of particulars was raised, *for the first time,* after trial had commenced.

It was as to such concrete circumstances that this Court said in *Lizotte* that the demand for notice of alibi had become the equivalent of a bill of particulars. The most that can be contended for the language in *Lizotte,* then, is that it was speaking in terms of *the specific circumstances there present.* Even this evaluation exceeds the *actual decision* of *Lizotte.* The holding of *Lizotte* is that defendant's requested instruction had attempted to confine the period for the commission of the offense to a range *narrower* than that stated in the demand for notice of alibi and, *for that reason alone,* was properly denied—regardless of whether the demand for notice of alibi might be considered to function in the manner of a bill of particu-

lars. It was thus unnecessary for the Court to say that a demand for notice of alibi is the equivalent of a bill of particulars.

Similarly, State v. Miller, supra, is without significance as precedent on the present issue. The sentence in *Miller:*

> "If the State had *served* such a notice upon the defendant, it would have been equivalent to a bill of particulars." (emphasis supplied) (253 A.2d p. 62)

and citing *Lizotte,* supra, is dictum in its most obvious form. The facts of the case in no respect involved a demand for notice of alibi. The Court was speaking entirely hypothetically.

We thus approach the issue now being explored on the basis that both *Lizotte* and *Miller* are, as to the present circumstances, without controlling effect as precedent and that the problems presented are open for original evaluation and decision.

Initially, we direct attention to the respective primary functions which the law intends that a demand for notice of alibi and a bill of particulars shall discharge.

■ The essence of the demand for notice of alibi is its function as a *discovery* device in advance of trial by which the prosecution achieves information to avoid surprise during trial. It is only in this aspect that the demand for notice of alibi is presently recognized as constitutional by the Supreme Court of the United States. Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). Furthermore, this idea of discovery before trial is separate and distinct from the concept of the *admissibility of evidence,* whether by the State or by the defendant, *during trial.*

See also: ABA Standards of Discovery And Procedure Before Trial, Supplement, (at pp. 5, 6) (Approved Draft, October, 1970) in which it is urged that sanctions imposed on a defendant for failure to comply with a demand

for notice of alibi should avoid limitations upon the evidence which defendant will be allowed to produce at trial.

That our Rule 16(b) undertakes to go further and to impose a sanction which relates to proof at trial—(in the form of potential denial of permission to the defendant "to introduce evidence at the trial tending to show the defense of alibi other than his own testimony")—fails to impair the validity of the point that the functions of discovery prior to trial and of the control of the scope and admissibility of evidence during trial are conceptually separate and distinct and can, in practice, be maintained as separate and distinct.[3]

■ While a bill of particulars has an incidental effect of affording the defendant benefits in the nature of pre-trial discovery, in that defendant is informed in advance of trial as to particular information, the essential purpose of the bill of particulars and its overriding importance as a benefit to the defendant is that it definitively affects the scope of the State's proof at trial and renders it subject to the principle of fatal variance. Once the prosecution has declared in a bill of particulars the time of the alleged offense, its proof becomes restricted to such time and "to justify a conviction such * * * [time] ha[s] to be established beyond a reasonable doubt." State v. Littlefield, Me., 219 A.2d 755, 758 (1966).

To avoid confusion in analysis and error in decision it is important, therefore, that we retain in mind clearly, and persistently, this basic difference in essential concept, purpose and effect between a demand for notice of alibi (as primarily a discovery device in advance of trial) and a bill of particulars (as primarily a mechanism to restrict the State in the scope of its proof at trial and to subject the State to the risk of fatal variance should the proof deviate from the particulars specified). The difference is enormously important since there are areas of potential conflict between the interests involved and the underlying policies.

For example, as a discovery device in advance of trial designed to protect the prosecution against surprise during trial, the demand for notice of alibi will be initiated by the prosecution. To achieve the benefit of the most complete information as to alibi evidence, the interests of the prosecution are likely to induce a proposal by the prosecution which encompasses as wide a latitude in time ranges as would reasonably withstand attack.

■ On the other hand, the bill of particulars, because of the huge benefit it confers upon the defendant and the severe stricture it imposes upon the prosecution, is required to be sought by the defendant. In addition, defendant is not entitled to it as of right; he must show cause for it. Rule 7(f) M.R.Crim.P. Fur-

3. The question of the constitutionality of the sanction aspect of our Rule 16(b)—by which defendant can be denied the right to produce relevant evidence having exculpatory probative force,—is not here raised and is, therefore, not before us in the case at bar. We intimate no opinion on the problem. It should be noted, however, that the issue was expressly left open by the Supreme Court of the United States in its decision in Williams v. Florida, supra. The Court said in footnote 14 at p. 83, 90 S.Ct. at p. 1897: "We emphasize that this case does not involve the question of the validity of the threatened sanction, had petitioner chosen not to comply with the notice-of-alibi rule. Whether and to what extent a State can enforce discovery rules against a defendant who fails to comply, by excluding relevant, probative evidence is a question raising Sixth Amendment issues which we have no occasion to explore. * * * It is enough that no such penalty was exacted here."

The extent to which the Supreme Court of the United States has left the issue open is further emphasized by some of the language of footnote 11 at p. 82, 90 S.Ct. at p. 1896, of the opinion in Williams v. Florida, supra, in which the Court stated: "We do not, of course, decide * * alibi-notice provisions * * * necessarily valid in all respects; that conclusion must await a specific context * *.'"

thermore, since the bill of particulars will be sought by the defendant fundamentally to accomplish a narrowing of the latitude allowable to the prosecution in the proof which the prosecution will offer at trial and the defendant will seek the advantage, to the fullest extent possible, of subjecting the prosecution to the risks of fatal variances, the interests of the defendant will motivate him to seek to strive for a bill of particulars which specifies as narrow a range of time as defendant can reasonably achieve.

To hold, therefore, that the mere "*service*" of a demand for notice of alibi by the prosecution, *ipso facto, forthwith, automatically and regardless of any other circumstances*, produces in the case, and provides to the defendant, a bill of particulars—regardless of whether the defendant wishes to have a bill of particulars at that time and even though defendant has, to that point, refrained from asking for one—is to say that defendant may have *imposed* upon him consequences relating to the scope of the prosecution's proof at trial (a matter of uniquely critical importance to the defendant) which defendant did not seek and which might be materially broader in range than defendant might wish.

That defendant might thereupon have opportunity to seek to have the demand for notice of alibi amended and narrow the range more to his liking is an insufficient answer. First, defendant will have been deprived of the *original initiative*, generally recognizable as properly his, to make more difficult the State's burden of providing proof. Second, defendant will have been compelled to seek to amend a document which has been made to serve *two* distinct theoretical functions but which yet remains, in its actual and concrete form, a *single unit*. In the interests of accurate reasoning and sound judicial administration courts should avoid the high probability of confusion and error inherent in an approach which establishes abstract, mechanical equivalences and requires the

defendant to ask for the amendment of a *solitary* document, embodying *unitary* statements as to a range of time, as a means of achieving a satisfactory accommodation among a *plurality* of potentially conflicting interests, functions and policies. Surely, it is more conducive to accuracy and clarity that the resolution of the tensions which can develop be achieved in terms of individualized factors operating in particular contexts of circumstances.

The conclusion is confirmed by an investigation of the factors which suggest affirmative need that the demand for notice of alibi assume, under *special* circumstances, the additional function of serving, in the manner of a bill of particulars, to limit the proof by the State at trial and subject the State to the doctrine of fatal variance.

Under Rule 16(b) the prosecution is required to delineate in the demand for notice of alibi a statement of what will be proved, as to time and place, at the trial. In this respect, the demand for notice of alibi would seem to move beyond the area of discovery prior to trial and to enter the domain of the scope of the proof to be offered during trial. It could be argued with a degree of reasonableness, therefore, that the time-designations of the demand for notice of alibi, in addition to providing the periods as to which the prosecution seeks discovery before trial, should operate, in the manner of a bill of particulars, to set the limits for the proof of time which the prosecution will be permitted at trial and deviation from which will produce a fatal variance.

To avoid overreach of the argument, however, we must emphasize that Rule 16 (b) requires the prosecution in a demand for notice of alibi to furnish the time and place it "*proposes* to establish at the trial" (emphasis supplied) rather than the time and place the State *will*, or *must*, establish. To transform a "proposal" of proof to obtain information before trial into a *restriction* of proof, at trial, of the degree of

stringency that deviation can constitute fatal variance (as is the case when a bill of particulars is operative—State v. Littlefield, supra), is a substantial extension in concept.

Clearly, a supplemental function of such enlarged proportions should not be attributed to a demand for notice of alibi on a *purely automatic* basis and merely because the prosecution elects to come forward with a "proposal" as to proof at trial of time (and place) for the purpose of obtaining information as to alibi in advance of trial. In this context, the analogy of the law of contracts and the principle that an "offer" must be "accepted" before legal obligation arises would seem appropriate. Only when the State's "proposal" for proof at trial has produced a response from, or effect upon, the defendant would it seem reasonable to conclude that obligations as to a restricted scope of proof at trial should arise.

On this approach, the earliest time at which the demand for notice of alibi should be deemed capable of becoming the equivalent of a bill of particulars would be either (1) when defendant has served and filed his notice of alibi in response to the State's demand and in reliance upon the State's "proposal" for proof, or, if defendant has declined to serve and file a notice of alibi, (2) when trial commences and defendant has thus become definitively affected by the State's demand for notice of alibi. As to this latter aspect, defendant can fairly be said to have suffered a detriment, trial having commenced, insofar as defendant will be exposed, during trial, to the risk that either (a) defendant can be impaired in his freedom to offer evidence, other than his own testimony, bearing upon the issue of alibi (on the assumption that it is constitutionally proper to deny defendant a right to offer relevant and probative exculpatory evidence), or (b) defendant might be confronted with a disrupted trial because alibi evidence which surprises the prosecution might result in a continuance of the trial with right afforded the pros-

ecution, during the period of the continuance, to make investigation in an effort to search out rebuttal evidence as to alibi. Cf. Williams v. Florida, supra, 399 U.S. at pages 85, 86, 90 S.Ct. 1893, 26 L.Ed.2d 446.

The principle of reciprocity yields another reason to conclude that a demand for notice of alibi should be held to extend into the realm of restricting the scope of the State's proof at trial. The State should pay a fair price for the detriment which the benefit conferred on the State (to have advance of trial information as to alibi) causes to the defendant.

It is to be stressed, however, that the reciprocity approach, even if accepted arguendo, is predicated on the premise that defendant has suffered detriment. Thus, it would appear fair that detriment to the defendant must have become *actual* rather than remain merely possible before a corresponding *actual* detriment should be imposed upon the State. Again, therefore, we are led to the conclusion that affirmative need, derived from the principle of reciprocity, indicates that the demand for notice of alibi shall assume the additional function of operating as the equivalent of a bill of particulars, to limit the scope of the State's proof at trial, *only when, and not before*, the defendant either (1) has served and filed the notice of alibi in response to the demand of the prosecution, or if defendant fails to file such notice, (2) has commenced trial and thus becomes definitively subject to sanctions which will arise during the course of trial.

The entirety of the foregoing discussion may be summarized as revealing the following basic points. There are dangers of confusion and error if a demand for notice of alibi (essentially a pre-trial discovery device) is treated routinely and inflexibly as a bill of particulars (essentially a mechanism for restricting the State in its proof at trial). These dangers are especially acute if the defendant, by appropriate motion, has himself sought a bill

of particulars and has, therefore, brought to the specific attention of the Court the precise issue of confinement of the scope of the State's proof at trial. The considerations suggestive of the need that, at some point of time and under some circumstances, a demand for notice of alibi, in fairness to the defendant, should be held to operate as a bill of particulars, indicate that the earliest time at which such function should be superimposed is either when the defendant has served and filed a notice of alibi, or in the absence of such notice of alibi, when trial has commenced.

■ In light of these conclusions we now decide that (1) a demand for notice of alibi is *incapable* of operating as a bill of particulars—to restrict the State's scope of proof at trial as to the time (or place) of the commission of the crime—at any time (a) *prior* to defendant's serving and filing a notice of alibi within the required time limits or, if such notice of alibi is never served and filed, (b) *prior* to the commencement of trial; and (2) *in any event*, and even though the circumstances within the context of the limitations described in (1) might permit a demand by the State for notice of alibi served and

filed under Rule 16(b) to be *capable* of serving as a bill of particulars, such function will be *precluded* if defendant has properly served and filed a motion for a bill of particulars covering time (or place) of the commission of the crime,[4] and such motion for bill of particulars remains pending in the case (or action has been taken upon it or pursuant to it).[5]

■ In the case before us defendant had seasonably served and filed a motion specifically seeking a bill of particulars pursuant to Rule 7(f) M.R.Crim.P., at a time when there was absent any notice of alibi and *before* the expiration of the time within which defendant was obliged to serve and file a notice of alibi.

This motion remained pending in the case and ultimately resulted in the State's filing a bill of particulars as to which the Court explicitly ruled and which the Court left operative for purposes of defining the scope of proof by the State at trial.

Applying the legal principles hereinbefore enunciated, therefore, we hold that the prosecution's demand for notice of alibi was *precluded* from functioning as the equivalent of a bill of particulars and thus

---

4. We expressly reserve decision upon the question, not presently involved, which would be precipitated were a defendant to serve and file a timely notice of alibi in response to the State's demand and were the defendant *thereafter* to attempt, for the first time, seasonably to serve and file an independent motion for a bill of particulars.

5. It might be possible, therefore, that a defendant who withholds serving and filing a notice of alibi could make the "proposals" for proof contained in a demand for notice of alibi binding on the State in the manner of a bill of particulars if the defendant refrains from filing any independent motion for a bill of particulars and allows trial to commence.

On the other hand, it is similarly possible that the State might attempt to avoid this outcome by seeking to amend its demand for notice of alibi previously served and filed (and as to which the defendant had omitted to serve and file a notice of alibi). Under such circumstances the

Court might be obliged to consider the issue presented in terms of the function of a demand for notice of alibi as a *discovery mechanism* rather than as one which could affect the scope of the State's freedom to offer proof at trial. This might well result in a decision that the State should be denied· further opportunity to discover alibi information on any broadened basis. The State could thus be left in the predicament that the demand for notice of alibi in its original form might become operative as the equivalent of a bill of particulars once trial were to commence.

For this reason, the prosecution should heed the warning: "Tactical considerations may suggest that the demand [for notice of alibi] not be made in every case * * *. This may tend to limit the proof of the State, for without the [demand] * * *, it may establish that the offense was committed at any time within the statutory period and not have a fatal variance." *Glassman*, Maine Practice, Rules of Criminal Procedure, Rule 16, § 16.4, at pp. 137, 138.

could not have the *determinative* effect (for which defendant erroneously contends) of restricting the scope of the State's proof at trial and allowing defendant the benefit of asserting fatal variance for deviation by the State from such restrictions. Such burden to the prosecution and benefit to the defendant could properly arise, when the precise issue had been directly raised by defendant in a motion for a bill of particulars, only from a decision of the Court upon that motion in which the Court would be explicitly evaluating the totality of facts, interests and policies having predominant (rather than ancillary), actual (rather than potential) and close (rather than remote) bearing upon the extent to which the State should be confined in its proof at trial of the time (or place) of the commission of the offenses.

By this decision, we are *not* holding that the serving and filing of a demand for notice of alibi, and the consequences arising from it to the defendant because of particular ways defendant might have acted in the case in response to, or in reliance upon, the demand for notice of alibi, will be *irrelevant* to the decision which the Court will make upon the questions raised by a motion for a bill of particulars. Rather, we decide only that in light of the theoretical and practical differences between the rights to discovery in advance of trial and the rights as to the scope of proof at trial, the defendant cannot claim the benefit that the prosecution has *automatically* become limited in its proof at trial of the time (and place) of the commission of the offenses charged, and subject to the strictures of the principles of fatal variance merely, and solely, because the State has sought such advance of trial discovery information.

■ Thus, if it were to appear that defendant had suffered some *special* and *unfair* prejudice caused by consequences of the State's efforts to achieve advance of trial information as to possible alibi contentions of defendant—(other than the claim by defendant, here held erroneous, that the State's demand for notice of alibi constitutes an *ipso facto* limitation of the State's proof and *automatically* gives the defendant the benefit of a right to claim fatal variance for deviation of the State's proof from the time specifications of the demand for notice of alibi)—the existence of such special and unfair prejudice to defendant would be relevant and material to the evaluation of whether the Court had abused its discretion in allowing to become operative a bill of particulars which specified a time interval for the commission of the offenses charged *broader* than that designated in the demand for notice of alibi.

Under the circumstances here before us, it is clear that there is absent any such special unfair prejudice to the defendant (if, indeed, there be special prejudice at all).

Defendant never served or filed any notice of alibi relating to the narrower time period mentioned in the demand for notice of alibi. Thus, defendant cannot reasonably maintain that the State had manipulated him to his disadvantage insofar as the State first ascertained that defendant had an alibi for the narrower period and thereupon achieved an enlargement of the time period within which, and without fatal variance, the State would be entitled to prove that the offenses had been committed—thereby des.roying the effectiveness of defendant's alibi.

Furthermore, defendant made no claim, as an incident of his objection to the validity of the amended bill of particulars, that (1) defendant had an alibi for the narrower interval, (2) was intending to serve and file a notice of alibi to preserve his rights of proof at the trial regarding the narrower period but (3) had delayed, beyond the allowable time for serving and filing a notice of alibi, for the reason that he felt obliged to await a ruling on the issue of the amended bill of particulars. The fact was, rather, that defendant never had

an alibi claim for the narrower period designated in the demand for notice of alibi, as shown by his failure at any time prior to trial to assert such notice of alibi and also by his failure to urge an alibi for the narrower period at any time during trial.[6]

Finally, defendant never asserted in any respect before trial that in his preparation for the trial of the case which was to commence on February 23, 1970, he had relied strongly on the narrower time period as designated in the demand for notice of alibi; and that he was, therefore, placed in a difficult predicament, prejudicial to him, when the Court authorized a broader time period under the bill of particulars as late as February 18, 1970.

Thus, the record shows an absence of specific reliance by the defendant upon *the more restricted time interval* of the demand for notice of alibi to be utilized in support of a possible claim by the defendant that he had been subjected to special and unfair prejudice by the Court's ruling which permitted the amended bill of particulars to stand with a time period for the commission of the offenses extending beyond that of the State's demand for notice of alibi.

As to the extra hours by which the amended bill of particulars exceeded the designation of the demand for notice of alibi—i. e., the hours between 9:30 p. m. and 11:50 p. m. on August 28, 1969 and the hours between 3:00 a. m. and 8:00 a. m. on August 29, 1969—defendant suffered no special unfair prejudice. In no respect was defendant deprived of opportunity to offer, or rely upon, any evidence by way of alibi as to these extended time periods. On the contrary, he was allowed to, and did, argue alibi considerations as to the

extra hours at the trial, in that he maintained to the jury (although the jury apparently refused to agree with him) that the State's evidence had itself proved (1) that the crimes were committed after 3:00 a. m. on August 29, 1969 (at a time when the sun was rising or had already risen), and (2) that the defendant could not have committed the offenses in that time because defendant was shown to have been in his own camper, several miles from the scene of the alleged offenses, during the period from 3:00 a. m. to approximately 5:45 a. m. on August 29, 1969.

We conclude, therefore, that the Court below acted without reversible error (1) in rejecting defendant's contention that the State's bill of particulars (served and filed as the result of the defendant's motion for a bill of particulars) must designate a time interval for commission of the offenses charged no broader than that specified in the State's demand for notice of alibi; and (2) in refusing to charge the jury, as requested by the defendant, that defendant must be acquitted if the jury found the offenses to have been committed at a time other than the range designated in the State's demand for notice of alibi.

II.

Another ground of appeal offered by defendant concerns the correct meaning and application of the last sentence of 15 M.R.S.A. § 1315—as amended by P.L.1969, Chapter 333 to read:

"The husband or wife of the accused is a competent witness except in regard to marital communications."

Defendant maintains that the presiding Justice committed reversible error when, over the objection of defendant, he permitted the wife of the accused to offer testi-

---

6. Regarding this narrower time period contained in the demand for notice of alibi, defendant relied at the trial on his claim of fatal variance in the State's proof of the time of commission of the offenses —rather than on alibi contentions—by maintaining that the State's proof established that the offenses, if committed at all (by anyone), must have been committed *after* 3:00 a. m. on August 29, 1969 because the evidence showed that, at the time of the offenses, the sun was rising or had already risen.

mony which was damaging to defendant and which defendant claims should have been excluded from evidence as "marital communications."

The testimony, in its essential aspects, was that Mrs. Benner, and her two children, a son and a daughter, were in the Benner's camper at Alford Lake, Maine. It was a type camper that consisted of a combination motor vehicle connected with a single room designed for living quarters. At approximately 1:00 a. m. on August 29, 1969, Mrs. Benner awoke and she then observed that her husband was absent from the camper and that his Cadillac automobile was gone. At 3:00 a. m. she was awakened by a door slamming and she heard someone enter the camper. At approximately 8:00 a. m. to 8:30 a. m. she arose from bed and proceeded about her daily activities. She noticed a sleeping bag on a bunk bed in the camper in which someone appeared to have slept. (Her daughter had been sleeping in another bed with her and her son had been sleeping on a bunk-arrangement which pulls down over the driver's seat in the cab of the camper and which was in the immediate vicinity of the door to the camper). Later in the morning of August 29, 1969 and while she was at the family home in Thomaston, a few miles from Alford Lake, Mrs. Benner noticed on a bed her husband's short-sleeved blue plaid shirt which, on the day before, she had washed. A clothing outfit belonging to the Benner's son was on the bed with the shirt, as was other clothing of the family.

It is first to be observed that the statute with which we are concerned, by language which is sparse and imprecise, purports to affect the competency, as a witness, of the "husband or wife of the accused." We are impelled, therefore, to investigate historical developments in an effort to ascertain legislative intent in relation to (1) whether the Legislature has retained any aspect of the common law incompetency, or disqualification, of a spouse to be a witness in a proceeding to which the other spouse is a party, or whether the Legislature has moved entirely into the area of privilege, and (2) dependent upon the answer to this preliminary question, the scope and nature of the subject-matter signified by the words, "marital communications."

Prior to 1855 one spouse was generally incompetent as a witness in any proceeding in which the other spouse was a party. A primary reason was that the existence of the marital relationship was deemed, conclusively, to create in the spouse of the party to a proceeding an interest in the outcome of the proceeding and thus, by operation of the additional common law principle that such interest produces incompetency, the spouse became incompetent as a witness in any proceeding to which the other spouse was a party. See: Dwelly v. Dwelly, 46 Me. 377 (1859).

In Dwelly v. Dwelly, supra, it was recognized that Maine statutes enacted in 1855 and 1856 (P.L. 1855, Chapter 181, § 1, P.L. 1856, Chapter 266, § 1) and as contained in the Revised Statutes of 1857 (R.S. 1857, Chapter 82, §§ 78–83, inclusive) had eliminated "interest in the event of the action" as a ground of witness incompetency regardless that the interest was that of a party to the proceeding.

It was further stated in Dwelly v. Dwelly, supra, however, that the elimination of interest as a ground of incompetency affected only one of the *plurality* of policy considerations which were responsible for the principle that one spouse was incompetent as a witness in any proceeding in which the other spouse was the party. Hence, it was decided in 1859, in Dwelly v. Dwelly, supra, that such *incompetency* of one spouse to testify as a witness in a proceeding to which the other spouse was a party persisted regardless of the statutes which had been enacted to, and including, 1857. See also: Walker v. Sanborn, 46 Me. 470 (1859).

In 1859 the Maine Legislature undertook to deal specifically with this incompetency which the decision in Dwelly v. Dwelly,

supra, had continued. By P.L. 1859, Chapter 102, the Legislature declared that as to *civil actions*

> "the husband and wife of either party shall be deemed competent witnesses, when the wife is called to testify by or with the consent of her husband, and the husband by or with the consent of his wife."

In 1866 the statute of 1859 was extended to cover *criminal* proceedings. P.L. 1866, Chapter 53.

The revision of 1871 embodied the provisions in two separate sections. It was stated in R.S. 1871, Chapter 82, § 82 which governed *civil* actions

> " * * * the husband or wife of either party may be a witness when either is called to testify with the consent of the other."

In relation to *criminal* actions, R.S. 1871, Chapter 134, § 19 provided:

> " * * * The husband or wife of the accused shall be a competent witness, when either is called, with the consent of the respondent."

In 1873 the consent factors were removed as to both civil and criminal proceedings. (P.L. 1873, Chapter 137, § 4 and § 5). Regarding criminal cases the statutory language was amended to read:

> " * * * the husband or wife of the accused shall be a competent witness."

No other statutory enactments after 1873 are material to the problem before us until the amendment effected in 1969 which introduced the language applicable to *criminal* cases, "except in regard to marital communications", and caused the statute to read:

> " * * * The husband or wife of the accused is a competent witness except in regard to marital communications."

In addition to the foregoing statutory enactments, we find historical enlighten-ment in various judicial decisions which had considered the legal effects of the statutes.

One important decision, Holyoke v. Estate of Holyoke, 110 Me. 469, 87 A. 40 (1913) concerned a problem which arose after the Legislature had provided, in 1873, that one spouse was competent regardless of consent, as a witness in a *civil* case to which the other spouse was a party. The specific issue in *Holyoke* centered around the extent to which the public policy considerations would remain operative (in spite of the 1873 statute) either (1) to continue to produce a partial testimonial *incompetency*, or (2) otherwise to require denying the admissibility into evidence of particular types of testimony by the spouse.

In Walker v. Sanborn, supra, the Court had suggested one such policy factor which the Court in Holyoke v. Estate of Holyoke, supra, utilized to decide that even though the incompetency of spouses as witnesses had been removed by statute, testimony by a spouse as to particular matters affecting the marital relationship could be excluded as evidence. The public policy consideration had been stated in Walker v. Sanborn, supra, as follows:

> "But there is another reason, * * * and it arises from the intimate and confidential relations subsisting between the parties. It treats all confidential communications, and whatever has come to the knowledge of either by means of the confidence which the relation inspires, as sacred, and not to be divulged in testimony even after death. It regards such disclosures and such facts as sacred, and like communications from client to counsel, which cannot be divulged but by express consent of the other party." (46 Me. p. 472.)

This language is significant. It tends to speak in terms strongly suggestive of a *privilege* which must be *claimed* by the spouse as distinguished from an incompetence, or disqualification, to testify. Such is the import of (a) the Court's mentioning

the analogy of the attorney-client relationship and the acknowledged *privilege* there operating to afford the protections deemed required by public policy, as well as (b) the plain and explicit words used by the Court:

"which cannot be divulged but by express consent of the other party."

Relying upon this aspect of Walker v. Sanborn, in which a marital privilege was indicated rather than a partial incompetency, or disqualification, Holyoke v. Estate of Holyoke, supra, concluded that, as to *civil* proceedings (and regardless that the spouses had been rendered competent as witnesses independently of consent), there was such a common law marital *privilege* which, if properly claimed by a spouse, can prevent the disclosure in testimony of particular matters even after termination of the marriage relationship.

The issue seems to have been finally settled as to civil proceedings when this Court decided Bond v. Bond, 127 Me. 117, 141 A. 833 (1928). The Court clarified that there had persisted since the common law a *privilege* incident to the marital relationship by which particular matters are protected against testimonial disclosure by a spouse and "which has nothing to do with the competency of husband or wife as witnesses." (p. 126, 141 A. p. 837)

As to criminal proceedings, however, as far back as the decision in State v. Black, 63 Me. 210 (1874)—decided one year after the spouse of the accused had been made competent as a witness independently of the consent of the accused—the Court explicitly differentiated *criminal* proceedings from those which, (vis-a-vis criminal) are classified as *civil*. The Court said:

"By the act of 1873 she [the spouse] is made [competent] * * * without his [the other spouse's] consent. Not to testify merely in his behalf, but to testify generally. The bar is thus not partially removed, but wholly so. There is more reason that she should be compel-led to testify against her husband in a criminal than in a civil cause. * * * [T]he State should have all possible *constitutional* means to ferret out and punish crime." (p. 212) (emphasis supplied)

It is unclear from the case whether the objection which had preserved the issue for appellate consideration dealt only with the error of the Court in allowing the wife to be called as a witness by the prosecution, thereby confining the ground of appeal to the question of the *competency* of the wife to be a witness *at all* against her husband as an accused, or whether there could also have been asserted a *privilege* that particular matters between the husband and wife were to be protected against testimonial disclosure. In any event, (1) the omission of the Court in its analysis to suggest the existence, in relation to *criminal* proceedings, of a privilege arising from the marital relationship (such as fifteen years previously, the Court, in Walker v. Sanborn, supra, had taken pains to mention as to civil proceedings) and (2) the express focus upon the nature of criminal proceedings as requiring "all possible constitutional means to ferret out and punish crime"—(language which has so strong a tendency to import a conclusion that any protection afforded by a marital privilege created by the common law *but not incorporated into the Constitution* would be inapplicable to *criminal* proceedings because it would hinder the ferreting out and punishment of crime)—engendered doubt, subsequently to 1874, of the existence of a privilege arising from the marital relationship operative in criminal proceedings.

Our research reveals that such doubt apparently persisted without legislative or judicial clarification until the legislative amendment of 1969 which is presently before us.

The 1969 exception for "marital communications" as applicable in criminal proceedings is worded in language which is cryptic and ambiguous. There is a lack

of legislative debate to provide guidance. We do, however, derive substantial assistance from the legislative and judicial history which we have recounted. This history elucidates that in the jurisprudence of Maine the words "marital communications" had become a form of shorthand to connote the existence of a *privilege* for the benefit of the husband or wife (or both) which, when appropriately claimed, functions to protect against the testimonial disclosure by a spouse of specific matters connected with the marital relationship.

■ In light of this history, we now decide that even though the 1969 exception for "marital communications" was created in the context of witness *competency,* the Legislature was intending to specify a *privilege* (rather than a limitation upon competency or a disqualification)—a privilege which would be operative, not automatically or inherently, but when appropriately claimed and which, therefore, could be the proper subject of waiver.[7]

As to the scope, and nature, of the protection afforded by this "husband-wife" privilege, one of the primary considerations which underlay the common law establishment of the incompetency, or disqualification, of one spouse to be a witness in a case in which the other spouse was a party was the purpose of preventing the strife and hostility which could arise between spouses if one were, advertently or inadvertently, to harm the interests of the other as they might develop, expectedly or unexpectedly, in a case. It was considered important at the common law that no such potential cause of family strife be allowed. This objective (among others) was accomplished by the establishment of an *absolute barrier* which prevented the spouse from being a witness in any respect (incompetency) in a proceeding in which the other spouse was a party. Cf. Walker v. Sanborn, supra, 46 Me. at pp. 471, 472.

With the legislative removal of this absolute barrier, the force of the policy concern to avoid·marital strife and hostility, as a value endowed with primacy over the search for truth, was markedly dissipated. There remained, however, an *additional and independent* public policy consideration relevant to the marital relationship. The common law had always recognized that happiness and harmony in marriage involves more than the negative absence of hostility and strife; there is further to be encouraged a positive sharing of affection and intimacy between the spouses. The common law, therefore, had sought to provide this special, distinct and highly prized value of marriage by affording a protection for that aspect of the marriage relationship in which the husband and wife are motivated to share *confidences* with each other.

It was this factor of *confidentiality* in the marriage relationship, and the need to foster and preserve it, to which the Court made reference in Walker v. Sanborn, supra, when it spoke of "*confidential* communications, and whatever has come to the knowledge of either *by means of the confidence* which the relation inspires," (p. 472) (emphasis supplied) ; and upon which the Court in Holyoke v. Estate of Holyoke, supra, premised the privilege as being "based upon the necessity of preserving *the confidence* which must exist in order to

---

7. We are aware that in the Commonwealth of Massachusetts the Court has held that the language of the Massachusetts statute reading:

"Any person * * * although a party, may testify in any proceeding, civil or criminal, * * * except as follows:

"First, * * * neither husband nor wife shall testify as to private conversations with the other. * * * *"

Mass.Gen.Laws, Chapter 233, § 20 establishes a witness disability, or disqualification, rather than a protective privilege. Kaye v. Newhall, 356 Mass. 300, 249 N.E.2d 583 (1969).

It is sufficient to state that the entirety of the language of the Massachusetts statute, as well as the special statutory and judicial history in Maine, reveal a sufficient basis for the different conclusion which we have reached.

\* \* \* fulfill the purposes of marriage, \* \* \*." (110 Me. p. 474, 87 A. p. 43) (emphasis supplied); and which the Court repeatedly mentioned in Bond v. Bond, supra,—as the central reason for the existence of a marital privilege, operative in civil proceedings, "which has nothing to do with the competency of the husband or wife as witnesses" (127 Me. p. 126, 141 A. p. 837)—by the language: *"confidential* communications" and "confessions and admissions *confidential* in their nature and all communications that can be said to be induced by the *confidence* presumed to be inherent to the marital relations." (p. 127, 141 A. p. 837) (emphasis supplied)

■ Although the 1969 statute omits the word "confidential" and speaks only of "marital communications", generally, we believe that it was the intention of the Legislature to specify the existence of a "husband-wife" privilege within the contours which the Court had previously established *in civil cases and as to which in criminal* proceedings State v. Black, supra, had created doubts. We decide, therefore, that

the 1969 amendment intended to affirm the existence, and operation, of a privilege in *criminal* cases,—as the Maine Court had previously delineated its foundation in *civil* cases—predicated upon a concern to achieve the intimacy and warmth between a husband and wife which would result from the encouragement of a sharing of confidentiality between them. The element of *confidentiality* is thus essential to the operation of the privilege in *criminal* cases, as it had previously been made an essential by judicial evaluation and decision in civil cases.[8]

It is unnecessary to resolve by a decision in the case before us those issues left unsettled by the *decisions,* but discussed in dicta, of the cases since 1873, and above set forth, which have dealt with the marital *confidentiality* privilege in the civil sphere —i. e., whether the protection is afforded only to conduct which utilizes words to transmit information, attitudes or emotions, or whether it is sufficiently broad to encompass other types of conduct which have such natural and probable "communicative"

8. The Proposed Rules of Evidence for the U. S. District Courts and Magistrates (1971 Draft) create a privilege in relation to testimony by a husband or wife and applicable only in a criminal proceeding in which one spouse is the accused, which reads as follows:

"A person has a privilege to prevent *any testimony of his spouse from being* admitted in evidence in a criminal proceeding against him." (Proposed Rule 505(a)) (p. 55)

The Advisory Committee's Note states: "About 30 jurisdictions recognize a privilege of an accused in a criminal case to prevent his or her spouse from testifying. It is believed to represent the one aspect of marital privilege the continuation of which is warranted." (p. 56)

In addition, the Advisory Committee's Note clarifies that the proposed rule "recognizes no privilege for confidential communications" regardless of whether the proceeding be criminal or civil (and *regardless of who the parties to the pro-*ceeding might be). While the reasons given for omitting a generalized privilege for "confidential communications" have merit, we believe that the total approach

taken in the proposed Federal rules of evidence—which combines the elimination of *any* privilege for confidential communications both in civil and criminal cases with the creation of a single extremely broad privilege applicable to criminal cases in which when one spouse is an accused any testimony by the other spouse can be precluded—is fundamentally alien to Maine jurisprudence as we have evaluated it.

We believe that were we to attribute to the Legislature an intention, by its use of the summary language "marital communications" substantially to depart from the clear indications of Maine history, we should be indulging in judicial legislation. If it be the intention of the Legislature of Maine to establish in criminal proceedings the kind of privilege proposed by Rule 505(a) of the proposed Federal rules of evidence and to eliminate the general application of a privilege for "confidential communications", between husband and wife (or either of these objectives), the Legislature should announce such intention by plain and explicit language which is more strongly indicative of such result than the two words, "marital communications."

tendency. We may assume, arguendo, and without deciding, that, as defendant contends, the privilege comprehends within its protection conduct other than exchanges through use of words.

The emphasis remains, however, that we have decided that any conduct (whether employing words or otherwise) sought to be protected against testimonial disclosure under the marital privilege must lie within a context of *confidentiality*.

In this respect, the principle appears clearly, in the cases decided as to civil proceedings, that the fact alone that conduct occurs while the marriage relationship exists, or that it takes place within the confines of the marital home, or that only the husband and wife are involved *can be insufficient* to confer the protection of the marital privilege on the basis of *confidentiality*. In Holyoke v. Estate of Holyoke, supra, the Court held the privilege inapplicable because "there is no suggestion of confidence", as the operative factor which produced the oral declarations by a husband to his wife, when the circumstances were that the husband and wife were living in separation and were actively hostile one to another. Likewise, hostile or abusive conduct by one spouse toward, or against the other, although occurring while they were alone, lies outside the protection of the privilege because it eliminates confidentiality as inducement to the conduct. Bond v. Bond, supra.

Finally, even though the conduct occurred in the presence of the wife and while the husband and wife were living together, and there was absent indication of hostility between them, confidentiality was held lacking as inducement to conduct by the husband which involved the presence of a third person. Walker v. Sanborn, supra, and Burrill v. Giles, 119 Me. 111, 109 A. 390 (1920).

We now decide, therefore, that conduct of a spouse—(whether by use of words, or otherwise, to convey information,

attitudes or emotional states)—is *capable* of falling within the scope of the privilege which protects against testimonial disclosure by one spouse in a criminal proceeding in which the other spouse is the accused, *only if confidentiality* between husband and wife is an *actual inducing* factor of the conduct. Hence, if confidentiality confined to husband and wife has not been purposefully and expressly sought or invoked, it must appear, as a minimally necessary condition, that the spouse whose conduct is sought to be protected by claim of privilege must have acted in *reliance* upon an *expectancy, reasonable* under all the circumstances, that the conduct itself, or other consequences which it might convey, will be transmitted *only* to the spouse and *to no other person* (such that a *confidentiality confined to husband and wife* can be a reasonable possibility under the circumstances).

In the application of these principles to the facts of the case at bar, we find it unnecessary to become involved with explicit consideration, or decision, of the problem carefully discussed in 8 Wigmore, Evidence (McNaughton rev. 1961), Section 2336 as to whether:

"* * * [the] confidence * * * is to be *presumed to have been intended* in all marital communications until the contrary appears, or whether the burden * * * should be upon the person claiming the privilege." (p. 648)

In the instant case it is clear that the conduct of defendant concerning which his wife was permitted to testify occurred without any purpose, consciously or expressly invoked by the defendant, that his conduct be kept secret and as a confidence to be shared only between husband and wife.

Furthermore, we are satisfied that the surrounding circumstances adequately reveal that defendant acted *without reliance* upon any *reasonable expectancy* that his wife *would* be the only person to become aware of his conduct and that it reason-

ably would, or reasonably could, be a matter *confined* between his wife and himself, to be shared by them alone as confidential.

At all times during the night of August 28, 1969 and early morning of August 29, 1969 the children of the Benners, a son eight years of age and a daughter three years of age,[9] were in the camper with Mrs. Benner. We may ignore the presence of the daughter because her tender age would render her incompetent as a potential witness. The presence of the son, however, who was of sufficient age to know and to be able to testify as to his observations suffices to remove confidentiality as an inducement to the actions of defendant inside the camper and in entering and leaving it.

It was apparent that the son was as likely as Mrs. Benner to awake, or be awakened, and to become aware of defendant's absence from the camper between 1:00 a. m. and 3:00 a. m. The son was sleeping much closer to the door of the camper than was Mrs. Benner. The evidence revealed that the door had slammed when the person, if it was the defendant, entered the camper at 3:00 a. m. It was as likely, if not more so, that the son, as Mrs. Benner, would be awakened by the slamming of the door. If it was defendant who had entered, defendant was aware of the circumstances establishing such likelihood that his son, as well as his wife, would know, or learn, of his arrival at the camper and of what he subsequently did in the camper. Furthermore, as to defendant's entering and leaving the camper and removing his Cadillac automobile, defendant must have been reasonably aware that he could easily have been observed in his conduct by any other persons who might have been in the vicinity of the camper.

As to the shirt which was on the bed at the house in Thomaston, it had been placed there along with clothing of other members of the family, including especially an outfit which belonged to the son. Defendant should, therefore, have reasonably expected —(if he was the person who put the shirt on the bed and since nothing else appears in the evidence to show that the other clothing came on to the bed any time after defendant's shirt was placed there)—that his son might go to the bed to take his own clothing and might see the blue plaid shirt of the defendant.

Under all of these circumstances revealing reasonable probabilities (of which defendant must be held to have been aware) that one or more persons other than his wife could, or would, learn of defendant's conduct, the presiding Justice was warranted in concluding that defendant had been acting without reliance upon a reasonable expectancy that *only* his wife would know, or learn, of his conduct. Confidentiality with his wife, therefore, was absent as a factor inducing the conduct of the defendant.

The presiding Justice acted without error in admitting into evidence the testimony of Sylvia Benner, the wife of defendant.

### III.

The last ground of appeal claimed by the defendant is that reversible error occurred when counsel for the State said in his closing argument to the jury:

> "You will recall the testimony of Mrs. Benner of the washing of the clothing, the washing of the clothing he had worn the day before that she had washed the previous day, and she stated, I believe, and it is for you to recall, that she did not do a washing that morning."

Defendant contends that in these remarks of the prosecution there were two misstatements of the evidence: (1) that the clothing (shirt) which defendant had worn

---

9. Which child was of which age was not in the evidence presented before the jury. It had, however, been brought to the Court's attention in the preliminary hearing which the presiding Justice had conducted as a basis for his ruling upon the admissibility of evidence. It is thus properly available to this Court for assessment of the correctness of the presiding Justice's determination.

during the night of August 28, 1969 and early morning of August 29, 1969, and which had been washed by defendant's wife on August 28, 1969 prior to defendant's wearing it, was washed again on August 29, 1969 after defendant had worn it, and (2) that Mrs. Benner did no washing of clothing on August 29, 1969. Defendant says that he was prejudiced by these alleged incorrect references to the evidence in that the jury probably was led to reach a conclusion, unsupported by the evidence, that defendant had himself washed the shirt after he had worn it.

 It is unnecessary that we consider whether defendant's interpretation of the meaning of the remarks of counsel is reasonable or whether they presented essentially incorrect summaries of the evidence. Even if defendant's interpretation be accepted at face value, his conclusion that he suffered prejudice which requires reversal must be rejected.

Had the jury been induced by the statements of the prosecutor to believe that defendant had washed the shirt after he had worn it, it is highly conjectural that such determination contributed to defendant's conviction. The conclusion is unwarranted that the jury could rationally, in the light of all of the evidence in the case, believe that such washing of the shirt, if done by defendant, was to remove from the shirt tangible and material substances which might indicate involvement in the alleged crimes. There was nothing in the evidence to suggest that there had been any blood, or other staining substance, or other sediment or matter uniquely, or significantly, related to the alleged crimes and which could have stained the shirt or caused some other type of deposit upon it and which defendant, to avoid incrimination, would seek to remove by washing. Indeed, in recognition of this state of the totality of the evidence, counsel for the prosecution himself made no effort to claim in argument that if defendant had washed the shirt, he had done it to remove any concrete and tangible indication of guilt. He argued, rather, that it would be a symbolic, psychological "cleansing" effect, a "desire to rid one's mind of that responsibility." This seems a strained, far-fetched argument by counsel for the State and it is most doubtful that it had any impact on the jury to contribute to the jury's verdict of guilt.

In any event, it is highly unlikely that the jury in reaching its conclusions accepted any of the alleged misstatements (if misstatements they were) of the evidence as contained in the remarks of counsel. There had been ample cautionary statements by counsel for the State, as well as instructions by the Court to the jury, that the summaries made by counsel in their closing arguments and their statements as to their recollections of the evidence are not evidence and that only the jury's recollection of the evidence is controlling and determinative. In the very remarks which are presently under attack counsel for the State reminded the jury that "it is for you to recall." Counsel for the State had made similar remarks at the commencement of his closing argument and repeated them at the outset of his rebuttal argument to the jury. Furthermore, at least twice during the course of the closing argument of counsel for the defendant incidents arose which caused the presiding Justice to instruct the jury that the statements of any attorney regarding the evidence are not themselves evidence, that only the jury's recollection of the evidence controls and that counsel's statements are to be disregarded if the jury's recollection is different from that of counsel. The presiding Justice repeated the point in his closing charge to the jury. All of these cautions to the jury were adequate, we are convinced, to ensure that the jury would confine itself to the evidence and would ignore incorrect recollections of counsel offered in closing argument.

The final factor which dissipates any possibility of merit in the contention of defendant is that defendant now raises the issue for the first time on appeal without having objected to the remarks of counsel

for the State at any time during trial and when there was opportunity for the presiding Justice, should he have deemed it necessary, to take direct corrective measures. Under such circumstances, to achieve reversal of his conviction, defendant must convince this Court that the remarks of which he now complains had produced prejudice to him so severe "as virtually to deprive the * * * [defendant] of a fair trial" State v. Langley, Me., 242 A.2d 688, 690 (1968).

Measured by this standard the claim of the defendant falls woefully short. Under all the circumstances before us, we should be perpetrating a serious injustice upon the people of the State of Maine rather than upon the defendant were we to seize upon the single sentence in the closing argument of counsel for the State to overturn a jury verdict of guilt which the entire record shows was supported by evidence more than sufficient to convict.

The entry must be:

Appeal denied.

All Justices concurring.