NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12237

MARIANNE AJEMIAN, coadministrator,[1] & another[2] vs.  YAHOO!, INC.


Norfolk.     March 9, 2017. - October 16, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, Lowy, & Budd, JJ.[3]


Internet.  Personal Property, Ownership.  Executor and
    Administrator, Recovery of assets, Contracts.  Contract,
    Service contract.  Agency, What constitutes.  Statute,
    Construction.  Consent.  Federal Preemption.



Complaint filed in the Norfolk Division of the Probate and
Family Court Department on September 15, 2009.

Following review by the Appeals Court, 83 Mass. App. Ct.
565 (2013), the case was heard by John D. Casey, J., on motions
for summary judgment.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Robert L. Kirby, Jr. (Thomas E. Kenney also present) for
the plaintiffs.

---

[1] Of the estate of John G. Ajemian.

[2] Robert Ajemian, individually and as coadministrator of the
estate of John G. Ajemian.

[3] Justice Hines participated in the deliberation on this
case prior to her retirement.

Marc J. Zwillinger (Jeffrey G. Landis also present) for the defendant.

Mason Kortz, for Naomi Cahn & others, amici curiae, submitted a brief.

James R. McCullagh & Ryan T. Mrazik, of Washington, & Joseph Aronson, for NetChoice & another, amici curiae, submitted a brief.

LENK, J.  This case concerns access sought by the personal representatives of an estate to a decedent's electronic mail (e-mail) account.  Such an account is a form of property often referred to as a "digital asset."  On August 10, 2006, forty-three year old John Ajemian died in a bicycle accident; he had no will.  He left behind a Yahoo!, Inc. (Yahoo), e-mail account that he and his brother, Robert Ajemian,[4] had opened four years earlier; he left no instructions regarding treatment of the account.  Robert and Marianne Ajemian, John's siblings, subsequently were appointed as personal representatives of their brother's estate.  In that capacity, they sought access to the contents of the e-mail account.  While providing certain descriptive information, Yahoo declined to provide access to the account, claiming that it was prohibited from doing so by certain requirements of the Stored Communications Act (SCA), 18 U.S.C. §§ 2701 et seq.  Yahoo also maintained that the terms of service governing the e-mail account provided it with discretion to reject the personal representatives' request.  The siblings

---

[4] Because they share a last name, we refer to the members of the Ajemian family by their first names.

commenced an action in the Probate and Family Court challenging Yahoo's refusal, and a judge of that court allowed Yahoo's motion for summary judgment on the ground that the requested disclosure was prohibited by the SCA.  This appeal followed.

We are called upon to determine whether the SCA prohibits Yahoo from voluntarily disclosing the contents of the e-mail account to the personal representatives of the decedent's estate.  We conclude that the SCA does not prohibit such disclosure.  Rather, it permits Yahoo to divulge the contents of the e-mail account where, as here, the personal representatives lawfully consent to disclosure on the decedent's behalf.  Accordingly, summary judgment for Yahoo on this basis should not have been allowed.

In its motion for summary judgment, Yahoo argued also that it was entitled to judgment as a matter of law on the basis of the terms of service agreement, claiming thereby to have discretion to decline the requested access.  Noting that material issues of fact pertinent to the enforceability of the contract remained in dispute, the judge properly declined to enter summary judgment for either party on that basis.  Accordingly, the judgment must be vacated and set aside, and the matter remanded to the Probate and Family Court for further

proceedings.[5]

1. Background. In reviewing the allowance of a motion for summary judgment, "we 'summarize the relevant facts in the light most favorable to the [non-moving parties].'" Chambers v. RDI Logistics, Inc., 476 Mass. 95, 96 (2016), quoting Somers v. Converged Access, Inc., 454 Mass. 582, 584 (2009). We recite the facts based on the parties' joint statement of facts, the Probate and Family Court judge's decision, and the documents in the summary judgment record. See Mass R. Civ. P. 56, 365 Mass. 824 (1974).

In August, 2002, Robert[6] set up a Yahoo e-mail account for his brother John. John used the account as his primary e-mail address until his death on August 10, 2006. He died intestate and left no instructions concerning the disposition of the account. Shortly before a Probate and Family Court judge appointed Robert and Marianne as personal representatives for John's estate,[7] Marianne sent Yahoo a written request for access

---

[5] We acknowledge the amicus briefs of Naomi Cahn, James D. Lamm, Michael Overing, and Suzanne Brown Walsh, and of NetChoice and the Internet Association.

[6] The personal representatives assert that Robert set up the electronic mail (e-mail) account for the benefit of John, but that both brothers had the password to the account, and that, with John's permission, Robert used it occasionally. Since he used it rarely, he has forgotten the password. Yahoo!, Inc. (Yahoo), claims that John set up the account.

[7] The Uniform Probate Code defines a personal representative

to John's e-mail account.  Yahoo declined to provide such access; it wrote that it would instead furnish subscriber information[8] only if presented with a court order mandating disclosure to the account holder's personal representatives. Robert and Marianne subsequently obtained such an order, and Yahoo provided them the subscriber record information.

In September, 2009, Robert and Marianne filed a complaint in the Probate and Family Court seeking a judgment declaring that they were entitled to unfettered access to the messages in the decedent's e-mail account; they also asked that Yahoo be ordered to provide the requested access.  After the judge allowed Yahoo's motion to dismiss their complaint, the Appeals Court vacated the judgment.[9]  It remanded the matter to the

---

as the "executor, administrator, successor personal representative, special administrator, special personal representative, and persons who perform substantially the same function under the law governing their status."  G. L. c. 190B, § 1-201 (37).

[8] The subscriber information provided by Yahoo includes e-mail "header" information -- i.e., the sender, addressees, and time stamp for e-mail messages -- for each e-mail message sent and received, and basic information about the subscriber.

[9] The Probate and Family Court judge (the same judge who later ruled on the cross motions for summary judgment) dismissed the complaint on the grounds that a forum selection clause in the terms of service for the decedent's e-mail account required that the action be brought in California.  He also determined that res judicata precluded the personal representatives from filing their claim in Massachusetts.  The Appeals Court concluded that the doctrine of res judicata did not apply to the allegations in the complaint and that the forum selection and

Probate and Family Court for a determination whether the SCA bars Yahoo from releasing the contents of John's e-mail account to his siblings as the personal representatives of the estate. See Ajemian v. Yahoo!, Inc., 83 Mass. App. Ct. 565, 580 (2013).

On remand, the parties filed cross motions for summary judgment. Robert and Marianne claimed that they were entitled to access the contents of the Yahoo account because those contents were property of the estate. Yahoo's position was two-fold: the SCA prohibited the requested disclosure and, even if it did not, any common-law property right that the decedent otherwise might have had in the contents of the e-mail account had been contractually limited by the terms of service. In Yahoo's view, the terms of service granted it the right to deny access to, and even delete the contents of, the account at its sole discretion, thereby permitting it to refuse the personal representatives' request.

The judge framed the issue before him as, first, whether the SCA prohibited Yahoo from disclosing the contents of the e-mail account and, if it did not, whether the contents are property of the estate. While the judge allowed Yahoo's motion for summary judgment solely on the basis that the SCA barred

---

limitations clauses in the terms of service could not be enforced against the personal representatives. See Ajemian v. Yahoo!, Inc., 83 Mass. App. Ct. 565, 572-573, 577 (2013). These issues are not before us on appeal.

Yahoo from complying with the requested disclosure, he also addressed Yahoo's alternative contention that the terms of service contractually limited any property interest that the decedent had in the contents of the account and thereby allowed it to refuse access to such contents. The judge concluded both that the estate had a common-law property interest in the contents of the account and that the record before him was insufficient to establish that the terms of service agreement, purportedly limiting any such property interest, was itself enforceable.  More specifically, he determined that there were disputed issues of material fact concerning the formation of that agreement. The judge accordingly denied Yahoo's motion for summary judgment on this separate basis.

Robert and Marianne appealed, and we transferred the case to this court on our own motion.[10]

2.  Whether the SCA prohibits Yahoo from disclosing the contents of the e-mail account.  a.  Statutory overview. Congress enacted the SCA in 1986 "to update and clarify Federal privacy protections and standards in light of dramatic changes

---

[10] Yahoo did not cross-appeal as to the common-law property issue, and does not appear to have contested in the trial court or on appeal that, absent the terms of service, the decedent's estate would have a common-law property interest in the contents of the e-mail account.

in new computer and telecommunications technologies."[11]

S. Rep. No. 541, 99th Cong., 2d Sess., reprinted in 1986

U.S.C.C.A.N. 3555, 3555. Given these vast technical advances,

the purpose of the SCA is "to protect the privacy of users of

electronic communications by criminalizing the unauthorized

access of the contents and transactional records of stored wire

and electronic communications, while providing an avenue for law

enforcement entities to compel a provider of electronic

communication services to disclose the contents and records of

electronic communications."[12] Commonwealth v. Augustine, 467

---

[11] The Stored Communications Act (SCA) was enacted as Title II of the broader Electronic Communications Privacy Act, Pub. L. No. 99-508, 100 Stat. 1848 (1986).

[12] More broadly, the SCA serves to fill a potential gap in the protection afforded digital communications under the Fourth Amendment to the United States Constitution. When the SCA was enacted in 1986, the United States Supreme Court repeatedly had held that information revealed to third parties does not warrant Fourth Amendment protection because there is no reasonable expectation of privacy in something that already has been disclosed. See Smith v. Maryland, 442 U.S. 735, 745-746 (1979) (no reasonable expectation of privacy in telephone numbers that have been called from particular telephone because such information shared with third-party telephone company); United States v. Miller, 425 U.S. 435, 443 (1976) (banking records). Digital communications, including e-mail, are by nature shared with the Internet service providers that store them. See Kerr, A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It, 72 Geo. Wash. L. Rev. 1208, 1210 (2004) (Kerr). When Congress enacted the SCA, it did so, at least in part, in an effort to ensure that digital communications would be protected, in light of the United States Supreme Court's third-party doctrine. See S. Rep. No. 541, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 3555, 3557, citing Miller, supra ("because [digitally stored information] is

Mass. 230, 235 (2014), quoting In re Application of the U.S. for an Order Pursuant to 18 U.S.C. § 2703(d), 707 F.3d 283, 286-287 (4th Cir. 2013).

To achieve this purpose, the SCA provides a tripartite framework for protecting stored communications managed by electronic service providers.[13] First, subject to certain exceptions, it prohibits unauthorized third parties from accessing communications stored by service providers. See 18 U.S.C. § 2701. Second, it regulates when service providers voluntarily may disclose stored electronic communications. See 18 U.S.C. § 2702. Third, the statute prescribes when and how a government entity may compel a service provider to release

---

subject to control by a third party computer operator, the information may be subject to no constitutional privacy protection").

[13] The SCA distinguishes between "electronic services -- electronic communication services [ECS] and remote computing services [RCS]" Matter of a Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp., 829 F.3d 197, 206 (2d Cir. 2016) (Matter of a Warrant). The act defines ECS as any service which allows users to "send or receive wire or electronic communications," and RCS as a service that provides "storage or processing services by means of an electronic communications system." 18 U.S.C. §§ 2510, 2711. Today, the distinction between ECS and RCS providers essentially has gone the way of the switchboard operator, as most service providers deliver both ECS and RCS services to subscribers. See Kerr, supra at 1215 (most network service providers provide both ECS and RCS services); Matter of a Warrant, supra. In any event, this distinction is not material here, as the restrictions against voluntary disclosure of the contents of communications to private parties apply to both equally. See 18 U.S.C. § 2702. For convenience, we therefore refer to both types of providers as "service providers."

stored communications to it.  See 18 U.S.C. § 2703.

b.  Analysis.  At issue here is 18 U.S.C. § 2702, which restricts the voluntary disclosure of stored communications. That section prohibits entities that provide "service[s] to the public" from voluntarily disclosing the "contents"[14] of stored communications unless certain statutory exceptions apply.  See 18 U.S.C. § 2702(b)(1)-(8).  The exceptions contained in 18 U.S.C. § 2702(b) allow a service provider to disclose such contents without incurring civil liability under the SCA.[15]

Yahoo contends that 18 U.S.C. § 2702(a) prohibits it from disclosing the contents of the e-mail account, while the personal representatives argue that they fall within two of the enumerated exceptions.  The first of these, the so-called "agency exception," allows a service provider to disclose the

---

[14] The SCA defines "contents" as "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8), as incorporated in 18 U.S.C. § 2711(1). The term has been construed to mean "a person's intended message to another (i.e., the 'essential part' of the communication, the 'meaning conveyed,' and the 'thing one intends to convey')."  In re Zynga Privacy Litig., 750 F.3d 1098, 1106 (9th Cir. 2014). The personal representatives here agree that they are seeking access to "contents," i.e., the decedent's stored communications.

[15] The SCA affords a civil right of action to "any provider of electronic communication service, subscriber, or other person aggrieved by any violation of [the SCA] in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind."  18 U.S.C. § 2707(a).  Successful litigants are entitled to equitable relief, damages, and reasonable attorney's fees and costs.  18 U.S.C. § 2707(b).

contents of stored communications "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2702(b)(1). The second, the "lawful consent" exception, allows disclosure "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the [originator] in the case of remote computing service." 18 U.S.C. § 2702(b)(3). We address the applicability of each exception in turn.

i. Agency exception. The personal representatives contend that they are John's agents for the purposes of 18 U.S.C. § 2702(b)(1). Because "agent" is a common-law term, and the SCA does not provide an alternate definition, we look to the common law to determine its meaning. When Congress uses a common-law term, we must assume, absent a contrary indication, that it intends the common-law meaning. See Microsoft Corp. v. i4i Ltd. Partnership, 564 U.S. 91, 101 (2011); Beck v. Prupis, 529 U.S. 494, 500-501 (2000) ("when Congress uses language with a settled meaning at common law, Congress 'presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken'" [citation omitted]); Matter of a Warrant to Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corp., 829 F.3d 197, 212 (2d Cir. 2016) ("In construing statutes, we interpret a legal term of art in accordance with the term's traditional legal

meaning, unless the statute contains a persuasive indication that Congress intended otherwise").

Under the common law, both as construed in the Commonwealth and more generally, an "agent" "act[s] on the principal's behalf and [is] subject to the principal's control." Restatement (Third) of Agency § 1.01 (2006). See Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 743 (2000) ("An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control"). The decedent's personal representatives do not fall within the ambit of this common-law meaning; they were appointed by, and are subject to the control of, the Probate and Family Court, not the decedent. See G. L. c. 190B, § 3-601 (personal representatives appointed by Probate and Family Court); G. L. c. 190B, § 3-611 (personal representative subject to removal by Probate and Family Court); Restatement (Second) of Agency § 14F (1958) ("A person appointed by a court to manage the affairs of others is not an agent of the others"); Restatement (Third) of Agency § 1.01 comment f ("A relationship of agency is not present unless the person on whose behalf action is taken has the right to control the actor. Thus, if a person is appointed by a court to act as a receiver, the receiver is not the agent of the person whose affairs the receiver manages because the appointing

court retains the power to control the receiver").  Accordingly,
the personal representatives do not fall under the SCA's agency
exception.

   ii.  Lawful consent exception.  The personal
representatives claim also that they lawfully may consent to the
release of the contents of the decedent's e-mail account in
order to take possession of it as property of the estate.  See
18 U.S.C. § 2702(b)(3); G. L. c. 190B, § 3-709 (a) ("Except as
otherwise provided by a decedent's will, every personal
representative has a right to, and shall take possession or
control of, the decedent's property . . .").  Yahoo contends
that the personal representatives of the estate cannot lawfully
consent on behalf of the decedent, regardless of the estate's
property interest in the e-mail messages.[16]  In Yahoo's view, the

_____

[16] The question whether the e-mail messages are the property
of the estate was raised in the personal representatives'
complaint.  As previously discussed, on remand from the Appeals
Court, the Probate and Family Court judge addressed the
question, in dicta, concluding that the e-mail messages were the
property of the estate.  Yahoo in essence leaves this holding
unchallenged for purposes of this case, see note 10, supra,
contending instead that the terms of service agreement is a
binding contract that regulates access to the contents of the
account and supersedes any common-law property rights asserted
by the estate.  Given this, we do not address the judge's ruling
that the estate had a common-law property right in the contents
of the account.  We note, however, that numerous commentators
have concluded that users possess a property interest in the
contents of their e-mail accounts.  See Darrow & Ferrera, Who
Owns A Decedent's E-Mails:  Inheritable Probate Assets or
Property of the Network?, 10 N.Y.U. J. Legis. & Pub. Pol'y 281,
311-312 (2007) (arguing that e-mail should be construed as

lawful consent exception requires the user's actual consent --
i.e., express consent from a living user.

We thus are confronted with the novel question whether
lawful consent for purposes of access to stored communications
properly is limited to actual consent, such that it would
exclude a personal representative from consenting on a
decedent's behalf.[17]  We conclude that interpreting lawful

---

probate asset).  See also Arner, Looking Forward by Looking
Backward:  United States v. Jones Predicts Fourth Amendment
Property Rights Protections in E-Mail, 24 Geo. Mason U. Civ.
Rts. L.J. 349, 372-375 (2014); Lopez, Posthumous Privacy,
Decedent Intent, and Post-Mortem Access to Digital Assets, 24
Geo. Mason L. Rev. 183, 215-216 (2016); Watkins, Digital
Properties and Death:  What Will Your Heirs Have Access to After
You Die?, 62 Buff. L. Rev. 193, 198-200 (2014).

[17] There is no Federal or State case law of which we are
aware construing the meaning of lawful consent in this context.
The only potentially relevant case, cited by the parties, is In
re Request for Order Requiring Facebook, Inc., to Produce
Documents & Things, 923 F. Supp. 2d 1204 (N.D. Cal. 2012) (In re
Facebook).  That case concerned the Facebook account of a young
woman who died after falling from the twelfth floor of an
apartment building.  Id. at 1205.  While the police apparently
came to the conclusion that her death was a suicide, the woman's
parents disputed this account and sought to access her Facebook
account to present evidence of her state of mind in the days
leading up to her death.  Id.  The parents filed an ex parte
application to subpoena records from her Facebook account.  Id.
Facebook moved to quash the subpoena on the ground that it
violated the SCA.  Id.  The District Court judge ruled in favor
of Facebook on the ground that "civil subpoenas may not compel
production of records from providers like Facebook."  Id. at
1206.  The judge did, however, note in dictum that "nothing
prevents Facebook from concluding on its own that [the parents]
have standing to consent on [the woman's] behalf and providing
the requested materials voluntarily."  Id.

Yahoo emphasizes the holding of the decision quashing the

consent in such a manner would preclude personal representatives from accessing a decedent's stored communications and thereby result in the preemption of State probate and common law. Absent clear congressional intent to preempt such law, however, there is a presumption against such an interpretation. See Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141, 151 (2001) ("[R]espondents emphasize that the Washington statute involves both family law and probate law, areas of traditional [S]tate regulation. There is indeed a presumption against pre-emption in areas of traditional [S]tate regulation such as family law"); United States v. Texas, 507 U.S. 529, 534 (1993) ("[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and

subpoena on the ground that it violated the SCA. Id. That holding is inapposite here, however, as the issue before us is not whether the personal representatives may compel Yahoo to provide them access to the decedent's e-mail account, but whether Yahoo may provide them such access without violating the terms of the SCA. The personal representatives emphasize the dictum at the end of the decision in support of their contention that "nothing prevents" Yahoo from concluding that they may lawfully consent on the decedent's behalf. Id.

Yahoo also points to a decision issued after argument in this case concerning an executor's attempt to provide lawful consent on behalf of a decedent. See PPG Indus., Inc. vs. Jiangsu Tie Mao Glass Co., Ltd., U.S. Dist. Ct., No. 2:15-CV-965, slip op. at 1-2 (W.D. Pa. July 21, 2017). Like In re Facebook, however, that decision does not answer the question before us. See id. at 4 ("[T]he [c]ourt need not decide whether [the executor's consent] to production of [the decedent's] emails is sufficient to establish 'lawful consent' under § 2702[b][3]").

familiar principles, except when a statutory purpose to the contrary is evident" [citation omitted]).  The statutory language and legislative history of the lawful consent exception in the SCA do not evidence such a congressional intent.

A.  Presumption against preemption.  In interpreting a Federal statute, we presume that Congress did not intend to intrude upon traditional areas of State regulation or State common law unless it demonstrates a clear intent to do so.  See Egelhoff, 532 U.S. at 151; Texas, 507 U.S. at 534; Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977) ("we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress" [citation omitted]); Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident").  This presumption ensures that the "[F]ederal-[S]tate balance . . . will not be disturbed unintentionally by Congress or unnecessarily by the courts" (citation omitted).  See Jones, supra.

Congress enacted the SCA against a backdrop of State probate and common law allowing personal representatives to take

possession of the property of the estate.[18]  To construe lawful

---

[18] When the SCA was enacted, the probate laws of a majority of States allowed a personal representative to take control of the property of a decedent for the purpose of marshalling the assets of the estate.  See, e.g., Alaska Stat. § 13.16.380, inserted by 1972 Alaska Sess. Laws, c. 78, § 1 (every personal representative has right to take possession or control of decedent's property); Ariz. Rev. Stat. Ann. § 14-3709, inserted by 1973 Ariz. Sess. Laws, c. 75, § 4; Ark. Code Ann. § 28-49-101, as amended by 1961 Ark. Acts, Act 424, § 1; Idaho Code Ann. § 15-3-709, inserted by 1971 Idaho Sess. Laws, c. 111, § 1; Ind. Code § 29-1-13-1, as amended through 1979 Ind. Acts, P.L. 268, § 45; Iowa Code § 633.350, inserted by 1963 Iowa Acts, c. 326, § 350; Kan. Stat. Ann. § 59-1401, as amended through 1985 Kan. Sess. Laws, c. 191, § 20; Me. Rev. Stat. tit. 18-A, § 3-709, inserted by 1979 Me. Laws, c. 540, § 1; Md. Code Ann., Est. & Trusts § 7-102, inserted by 1974 Md. Laws, c. 11, § 2; Mich. Comp. Laws § 700.601, as amended by 1979 Mich. Pub. Acts, no. 51; Minn. Stat. § 524.3-709, inserted by 1974 Minn. Laws, c. 442, art. 3, § 524.3-709; N.J. Stat. Ann. § 3B:10-29, inserted by 1981 N.J. Laws, c. 405, § 3B; Okla. Stat. tit. 58, § 290, inserted by 1910 Okla. Sess. Laws § 6322; Or. Rev. Stat. § 114.225, inserted by 1969 Or. Laws, c. 591, § 121; 20 Pa. Cons. Stat. § 3311, inserted by 1972 Pa. Laws, P.L. 508, no. 164, § 2; Utah Code Ann. § 75-3-708, inserted by 1975 Utah Laws, c. 150, § 4; Wyo. Stat. Ann. § 2-7-401, as appearing in 1980 Wyo. Sess. Laws, c. 54, § 1.  See also Uniform Probate Code § 3-709 (1969), http://www.uniformlaws.org/shared/docs /probate%20code/upc_scan_1969.pdf [https://perma.cc/SG32-ZUHY] ("Except as otherwise provided by a decedent's will, every personal representative has a right to, and shall take possession or control of, the decedent's property, except that any real property or tangible personal property may be left with or surrendered to the person presumptively entitled thereto unless or until, in the judgment of the personal representative, possession of the property by him will be necessary for purposes of administration"); Uniform Law Commission, Probate Code, http://www.uniformlaws.org/Act.aspx?title=Probate%20Code [https://perma.cc/EZ9C-HURN] (Uniform Probate Code has been adopted by Virgin Islands and eighteen States, including Colorado, Florida, Hawaii, Massachusetts, Montana, Nebraska, New Mexico, North Dakota, South Carolina, and South Dakota); Uniform Probate Code, 8 U.L.A., Index, at 1 (Master ed. 2013).

At common law, personal representatives also have the right

consent as being limited to actual consent, thereby preventing personal representatives from gaining access to a decedent's stored communications, would significantly curtail the ability of personal representatives to perform their duties under State probate and common law.  Most significantly, this interpretation would result in the creation of a class of digital assets -- stored communications -- that could not be marshalled.[19] Moreover, since e-mail accounts often contain billing and other financial information, which was once readily available in paper form, an inability to access e-mail accounts could interfere

---

to take possession of a decedent's property on behalf of the estate.  See, e.g., Goodwin v. Jones, 3 Mass. 514, 518 (1807) (personal representative has right at common law to take possession of decedent's property); Matter of the Estate of Heinze, 224 N.Y. 1, 8 (1918) (court-appointed administrator has power over property of decedent under common law); Felton v. Felton, 213 N.C. 194, 194 (1938) (court-appointed administrators possess "legal title to the personal assets of their intestate's estate" pursuant to common law).

[19] See Banta, Inherit the Cloud:  The Role of Private Contracts in Distributing or Deleting Digital Assets at Death, 83 Fordham L. Rev. 799, 852 (2014) ("Email accounts and social networking sites are the new letters and personal records of today's society.  The historical importance of our digital records cannot be underestimated"); Edwards & Harbinja, Protecting Post-Mortem Privacy:  Reconsidering the Privacy Interests of the Deceased in A Digital World, 32 Cardozo Arts & Ent. L.J. 83, 117 (2013) ("More than ever before, 'ordinary people,' leave digital relics which may be highly personal and intimate, and are increasingly preserved and accessible in large volume after death"); Lamm, Kunz, Riehl, & Rademacher, The Digital Death Conundrum:  How Federal and State Laws Prevent Fiduciaries from Managing Digital Property, 68 U. Miami L. Rev. 385, 389-390 (2014) ("A 2011 survey found that U.S. consumers valued their digital assets, stored across multiple digital devices, at an average of $55,000 per person").

with the management of a decedent's estate.  See Banta, Inherit the Cloud:  The Role of Private Contracts in Distributing or Deleting Digital Assets at Death, 83 Fordham L. Rev. 799, 811 (2014) (noting importance of access to online accounts to individuals trying to manage deceased person's estate).

Nothing in the statutory language or the legislative history of the SCA evinces a clear congressional intent to intrude upon State prerogatives with respect to personal representatives of a decedent's estate.

B.  Statutory language.  The SCA does not define the term "lawful consent," and, unlike the hundreds of years of common law defining the meaning of the term "agent," there is no similar State common-law backdrop with respect to the phrase "lawful consent."  Accordingly, we begin with the ordinary meaning of the words.  See BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004) (statutory interpretation inquiry "begins with the statutory text").  "[C]onsent" is defined as "[a] voluntary yielding to what another proposes or desires." Black's Law Dictionary (10th ed. 2014).  "[L]awful" is defined as "[n]ot contrary to law; permitted or otherwise recognized by law."  Id. at 1018.  The plain meaning of the term "lawful consent" thus is consent permitted by law.

Nothing in this definition would suggest that lawful consent precludes consent by a personal representative on a

decedent's behalf.  Indeed, personal representatives provide

consent lawfully on a decedent's behalf in a variety of

circumstances under both Federal and common law.  For example, a

personal representative may provide consent to the disclosure of

a decedent's health information pursuant to the Health Insurance

Portability and Accountability Act of 1996, 42 U.S.C. §§ 1320d

et seq. (HIPAA).  See 45 C.F.R. § 164.502.  In like manner, a

personal representative may provide consent on a decedent's

behalf to a government search of a decedent's property.  See

United States v. Hunyady, 409 F.3d 297, 304 (6th Cir.), cert.

denied, 546 U.S. 1067 (2005).

At common law, a personal representative also may provide

consent on a decedent's behalf to the waiver of a number of

rights, including the attorney-client,[20] physician-patient,[21] and

---

[20] See, e.g., Sullivan v. Brabazon, 264 Mass. 276, 286 (1928) (personal representative may waive decedent's attorney-client privilege); Marker v. McCue, 50 Idaho 462 (1931) (same); Buuck v. Kruckeberg, 121 Ind. App. 262, 271 (1950) (same); Holyoke v. Holyoke's Estate, 110 Me. 469 (1913) (same); Grand Rapids Trust Co. v. Bellows 224 Mich. 504, 510-511 (1923) (same); Canty v. Halpin, 294 Mo. 96 (1922) (same); In re Parker's Estate, 78 Neb. 535 (1907) (same); Martin v. Shaen, 22 Wash. 2d 505, 512 (1945) (same).

[21] See Calhoun v. Jacobs, 141 F.2d 729, 729 (D.C. Cir. 1944) (personal representative may waive decedent's patient-physician privilege); Schirmer v. Baldwin, 182 Ark. 581 (1930) (same); Morris v. Morris, 119 Ind. 341 (1889) (same); Denning v. Butcher, 91 Iowa 425 (1894) (same); Fish v. Poorman, 85 Kan. 237 (1911) (same); N.Y. Life Ins. Co. v. Newman, 311 Mich. 368, 373 (1945) (same); In re Estate of Koenig, 247 Minn. 580, 588 (1956) (same); In re Gray's Estate, 88 Neb. 835 (1911); Grieve v.

psychotherapist-patient privilege.[22]  Under the Uniform Probate

Code,[23] a personal representative may sell a decedent's property,

Uniform Probate Code § 3-715(23); bring claims on the decedent's

behalf, id. at § 3-715(22); and vote the decedent's stocks, id.

at § 3-715(12).  Thus, a construction of lawful consent that

allows personal representatives to accede to the release of a

decedent's stored communications accords with the broad

authority of a lawfully appointed personal representative to act

on behalf of a decedent.

Finally, had Congress intended lawful consent to mean only

actual consent, it could have used language such as "actual

consent" or "express consent" rather than "lawful consent."

See, e.g., 18 U.S.C. § 2721(a)(2) (prohibiting State departments

of motor vehicles from releasing personal information "without

the express consent of the person to whom such information

applies" [emphasis supplied]); Central Bank of Denver, N.A. v.

First Interstate Bank of Denver, N.A., 511 U.S. 164, 176 (1994)

(Congress knew how to provide for liability for aiding and

---

Howard, 54 Utah 225 (1919) (same).

[22] See Dist. Attorney for the Norfolk Dist. v. Magraw, 417 Mass. 169, 172-174 (1994) (personal representative may waive psychotherapist-patient privilege); Rittenhouse v. Superior Court of Sacramento County, 235 Cal. App. 3d 1584, 1588 (1991) (same).

[23] See note 18, supra (listing jurisdictions that have adopted Uniform Probate Code).

abetting but chose not to do so); Pinter v. Dahl, 486 U.S. 622, 650 (1988) ("When Congress wished to create [substantial factor liability for an offense], it had little trouble doing so"); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 734 (1975) ("When Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble doing so expressly").

Accordingly, nothing in the language of the "lawful consent" exception evinces a clear congressional intent to preempt State probate and common law allowing personal representatives to provide consent on behalf of a decedent.

C.  Legislative history.  To the extent there is any ambiguity in the statutory language, we turn to the legislative history of the SCA.  See Block v. Community Nutrition Inst., 467 U.S. 340, 349 (1984) (all presumptions used in interpreting statutes may be overcome by "specific legislative history that is a reliable indicator of congressional intent"); United States v. Awadallah, 349 F.3d 42, 51 (2d Cir. 2003), cert. denied, 543 U.S. 1056 (2005) (court may look to statute's legislative history where text is ambiguous).  The reports of the House and Senate committees on the judiciary shed light on the purpose of the SCA and on 18 U.S.C. § 2702 in particular.  The Senate committee report explains that the purpose of the Electronic Communications Privacy Act (ECPA), the broader Federal statute

that includes the SCA, is to "protect against the unauthorized interception of electronic communications" and to "update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S. Rep. No. 541, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. at 3555. With regard to the ECPA, the House committee report states,

> "The purpose of the legislation is to amend title 18 of the United States Code to prohibit the interception of certain electronic communications; to provide procedures for interception of electronic communications by [F]ederal law enforcement officers; to provide procedures for access to communications records by [F]ederal law enforcement officers; to provide procedures for [F]ederal law enforcement access to electronically stored communications; and to ease certain procedural requirements for interception of wire communications by [F]ederal law enforcement officers."

H.R. Rep. No. 647, 99th Cong., 2d Sess., at 16 (1986). This stated purpose demonstrates congressional concern with the protection of stored communications against "unauthorized interception" by "overzealous law enforcement agencies, industrial spies and private parties." S. Rep. No. 541, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. at 3555, 3557. It does not suggest congressional concern over personal representatives accessing stored communications in conjunction with their duty to manage estate assets.[24]

---

[24] Given the nascent state of digital technology at the time of the SCA's enactment in 1986, the congressional silence on the

Beyond Congress's overarching purpose in passing the SCA, the House committee report notes that "lawful consent" "need not take the form of a formal written document of consent." H.R. Rep. No. 647, 99th Cong., 2d Sess., at 66. Instead, such consent "might be inferred to have arisen from a course of dealing . . . -- e.g., where a history of transactions between the parties offers a basis for reasonable understanding that a consent to disclosure attaches to a particular class of communications." Id. Moreover, lawful consent could "flow from a user having had a reasonable basis for knowing that disclosure or use may be made with respect to a communication, and having taken action that evidences acquiescence to such disclosure or use -- e.g. continued use of such an electronic communication system." Id.

Congress thereby intended lawful consent to encompass certain forms of implicit consent, such as those that arise from a course of dealing. At the very least, this suggests that

---

impact of the SCA on personal representatives is understandable. When the statute was enacted, the New York Times had mentioned the Internet a total of once. See Matter of a Warrant, 829 F.3d at 206, quoting Rosenzweig, Wizards, Bureaucrats, Warriors, and Hackers: Writing the History of the Internet, 103 Am. Hist. Rev. 1530, 1530 (1998). The World Wide Web had yet to be invented, and the use of e-mail by the general public was years in the future. Matter of a Warrant, supra. As one commentator noted, Congress at that time did not have any reason to foresee the development of digital communications "as a set of assets capable of inheritance or facilitating access to other assets." See Naomi Cahn, Probate Law Meets the Digital Age, 67 Vand. L. Rev. 1697, 1715 (2014).

Congress did not intend to place stringent limitations on lawful consent even for living users.  In sum, we discern nothing in the legislative history of the SCA to indicate a clear intent by Congress to limit lawful consent to "actual consent," such that it could thereby intrude upon State probate and common law.

Absent such clear congressional intent, "we . . . have a duty to accept the reading [of the statute] that disfavors preemption."  See Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005).  Because we must presume, then, that Congress did not intend the SCA to preempt such State laws, we conclude that the personal representatives may provide lawful consent on the decedent's behalf to the release of the contents of the Yahoo e-mail account.

This does not, however, require Yahoo to divulge the contents of the decedent's communications to the personal representatives.  We conclude only that the SCA does not stand in the way of Yahoo doing so and that summary judgment for Yahoo on this basis was not warranted.[25]

---

[25] The Legislature is, of course, not precluded from regulating the inheritability of digital assets.  Indeed, the Revised Uniform Fiduciary Access to Digital Assets Act, which addresses this issue, has been enacted by a majority of States, including more than a dozen that have done so in 2017, and eight more States currently are considering whether to do so.  See Fiduciary Access to Digital Assets Act, Revised (2015), http://www.uniformlaws.org/Act.aspx?title=Fiduciary%20Access%20to%20Digital%20Assets%20Act,%20Revised%20%282015%29 [https://perma.cc/9BAP-3WUW].

3.  Terms of service agreement.  Yahoo maintains that the allowance of its motion for summary judgment also was appropriate on the independent ground that the terms of service agreement, binding upon the decedent and his estate, confers on it the right to refuse the personal representatives access to the contents of the account.  Otherwise put, Yahoo contends that the terms of service trump the personal representatives' asserted property interest.

In support of this position, Yahoo relies on the "termination provision" in the terms of service, which purports to grant Yahoo nearly unlimited rights over the contents of the e-mail account.  That provision states:

> "You agree that Yahoo, in its sole discretion, may terminate your password, account (or any part thereof) or use of the Service, and remove and discard any Content within the Service, for any reason, including, without limitation, for lack of use or if Yahoo believes that you have violated or acted inconsistently with the letter or spirit of the [terms of service].  Yahoo may also in its sole discretion and at any time discontinue providing the Service, or any part thereof, with or without notice.  You agree that any termination of your access to the Service under any provision of [these terms of service] may be effected without prior notice, and acknowledge and agree that Yahoo may immediately deactivate or delete your account and all related information and files in your account and/or bar any further access to such files or the Service.  Further, you agree that Yahoo shall not be liable to you or any third-party for any termination of your access to the Service."

The express language of the termination provision, if enforceable, thus purports to grant Yahoo the apparently

unfettered right to deny access to the contents of the account and, if it so chooses, to destroy them rather than provide them to the personal representatives.[26]

Because the record before him was not adequate to establish the essentials of valid contract formation, the judge was unable to determine -- even as an initial matter -- whether the terms of service agreement could constitute an enforceable contract.[27] The judge observed that Yahoo had not established that a

---

[26] Yahoo's decision not to grant access to the contents of the account and its asserted right to destroy such contents (which it apparently has preserved thus far) is grounded in the substantive rights it claims to have under the terms of service agreement. It has forborne the exercise of those asserted rights during the pendency of this litigation, in which the enforceability of that contract is squarely at issue. See note 27, infra. To the extent that the dissent may suggest otherwise, we are unaware of any reason to believe that, upon remand, were the agreement in whole or pertinent part to be deemed unenforceable for any reason, Yahoo would engage in acts of spoliation or otherwise fail to comply with court orders requiring access to the contents of the account.

[27] The record does not include the parties' legal memoranda supporting their cross motions for summary judgment. Nonetheless, we infer from the judge's ruling, and the parties' briefs on appeal, that the focus of the issue regarding the enforceability of the agreement was as to matters of contract formation. Other considerations, such as consistency with public policy or any putative unconscionability of the terms of service, had yet to be reached. Nor does it appear that any dispute was raised regarding the meaning of the termination provision. We note further that Yahoo has agreed not to exercise its asserted rights under the terms of service "to remove and discard" any content of the e-mail account during the pendency of this litigation. The terms of service, however, include a provision stating that "[t]he failure of Yahoo to exercise or enforce any right or provision of the [terms of service] shall not constitute a waiver of such right or provision."

"meeting of the minds" had occurred with respect to the terms of
service, including whether they had been communicated to, and
accepted by, the decedent.  The judge accordingly denied Yahoo's
motion for summary judgment on this alternative ground.  We
discern no error in this regard, and remand the matter for
further proceedings.

4.  Conclusion.  The judgment is vacated and set aside.
The matter is remanded to the Probate and Family Court for
further proceedings consistent with this opinion.

So ordered.

GANTS, C.J. (concurring in part and dissenting in part). I agree with the court that the Stored Communications Act (SCA), 18 U.S.C. §§ 2701 et seq., does not prohibit Yahoo!, Inc. (Yahoo), from disclosing to the personal representatives of an estate the electronic mail (e-mail) messages in the decedent's account so that the personal representatives may perform their duties under our State probate and common law. I also agree with the court that the judge's allowance of summary judgment on behalf of Yahoo must be vacated. I write separately because, where there were cross motions for summary judgment, I would go beyond the court's order of remand and issue an order directing judgment in favor of the personal representatives on their motion for summary judgment.

In deciding the cross motions for summary judgment, the Probate and Family Court judge made two rulings of law. First, he ruled that "the content of the decedent's e-mails are property of the [e]state; there is no genuine issue of material fact as to this issue." Second, he ruled that "the SCA prohibits [Yahoo] from divulging the contents of the decedent's e-mails to the [p]ersonal [r]epresentatives." Yahoo does not challenge the first ruling on appeal. This court has determined that the second ruling is an error of law. However, rather than order that judgment issue in favor of the personal representatives on their complaint seeking a declaration that

they are entitled to complete access to the contents of the decedent's e-mail account, the court orders that the matter be remanded to the Probate and Family Court to adjudicate disputed issues of material fact as to whether the "terms of service" agreement constitutes a binding, enforceable contract that "trump[s] the personal representatives' asserted property interest" in the contents of the account.  <u>Ante</u> at    .

The order of remand is unnecessary.  I recognize that there remain disputed issues of fact as to whether the terms of service agreement was executed by the decedent and binds the estate, and unresolved disputed issues of law as to whether it would be contrary to public policy to enforce an agreement comprised of eleven pages of boilerplate language that a prospective user must accept "as is" before Yahoo will grant the user access to its service.  Therefore, for purposes of this opinion, I assume for the sake of argument that the terms of service agreement is both binding and enforceable against the estate.  But even with this assumption, when one looks closely at the specific section (section thirteen, governing termination) that Yahoo claims is relevant to the issue on appeal, it cannot as a matter of law yield a judgment in favor of Yahoo.

Section thirteen allows Yahoo "for any reason" to terminate a user's password, account, or use of the service, and to

"remove and discard any Content within the service."[1]  It further provides that Yahoo is not liable "for any termination of your access to the Service."  Yahoo does not and cannot contend that the authority claimed in this termination provision gives it any ownership interest in a user's content.  In fact, section eight of the terms of service provides, "Yahoo does not claim ownership of Content you submit or make available for inclusion on the Service."  All that section thirteen does is allow Yahoo to discard any of the content owned by the user (or, here, the estate of the user) on its servers without risk of liability for doing so.  Thus, it would permit Yahoo to discard e-mail messages in a terminated account without fear that it will be held liable if, many years later, the user's estate seeks access to those messages.

The issue on appeal, however, is not whether Yahoo is liable to the estate for content that it previously discarded, but whether a court may order Yahoo to provide the plaintiffs with content it continues to retain.  The provision cannot reasonably be interpreted to mean that Yahoo has the contractual right to destroy a user's e-mail messages after the user initiates a court action to obtain the messages.  Such destruction would violate our prohibition against the spoliation

---

[1] See _ante_ at     for the full text of section thirteen of the "terms of service" agreement.

of evidence. See <u>Keene</u> v. <u>Brigham & Women's Hosp., Inc.</u>, 439 Mass. 223, 234 (2003) (doctrine of spoliation of evidence "is based on the premise that a party who has negligently or intentionally lost or destroyed evidence known to be relevant for an upcoming legal proceeding should be held accountable for any unfair prejudice that results"). Nor can it justify the destruction of such e-mail messages after a court orders that they be provided to the user or his or her personal representatives. Such destruction would constitute contempt of a court order.

If the motion judge on remand were to rule that this provision contractually allows Yahoo to destroy e-mail messages in its possession that are owned by a user (or a personal representative of the estate of the user) after the user has filed a court action to obtain access to these messages, we would surely reverse that ruling. So why remand the case to permit that possibility?

Not only is the remand unnecessary, but it also is unfair to the plaintiffs. The additional cost of further litigation is a financial pinprick to a Web services provider such as Yahoo, but it is a heavy financial burden on the assets of an estate, even a substantial estate. The plaintiffs should not have to spend a penny more to obtain estate property in the possession of Yahoo that they need to administer the estate.